BELT'S WHARF WAREHOUSES, INC. *v.*
INTERNATIONAL PRODUCTS
CORPORATION ET AL.

[No. 206, October Term, 1956.]

586

*Decided June 7, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*William A. Fisher, Jr.,* with whom were *Rignal W. Bald-*

*win* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*Philip O. Roach,* with whom was *Benjamin Lipsitz* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

A corporate warehouseman appeals from a judgment on the verdict of a jury for damage to goods stored in its charge caused by the high tide that came above the floor of its pier warehouse when hurricane "Connie" struck Baltimore in August of 1955.

Code, 1951, Art. 14A, Sec. 21, declares the common law in the following language: "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." The issues between the parties are whether the warehouseman used such care in regard to the goods as a reasonably careful owner would have used and whether the damage could have been avoided, even if due care had been used.

The appellant, Belt's Wharf Warehouses, Inc., has been engaged in the warehouse business on the waterfront of Baltimore for many years. Belt's operates a number of separate but connected warehouses and one, known as pier 15, detached from the others, is a covered shed with sheet metal sides on a wooden floor, which is built on piles over Baltimore harbor. Pier 15 is one hundred ninety feet long and the harbor end is lower than the shore end, having settled as the years went by. Its floor is four feet eight inches above normal high tide. It is used mainly for bulk merchandise or merchandise which is not likely to be moved in and out often. Sometime after the middle of July, 1955, International Products Corporation, the appellee, advised Belt's that they would need some storage space for quebracho extract, a substance derived from the bark of trees and used by leather com-

panies for tanning, with which Belt's was familiar. Belt's officials decided to store the extract on pier 15. All of the extract came to the warehouse in railroad cars and the first shipment arrived on August 2. The warehouse receipts offered in evidence show that on August 2, 3, and 4 approximately seven hundred bags were received each day and placed on the harbor end of pier 15, that on August 5 approximately two thousand bags were received and so stored, and that on August 8 six hundred thirty more bags came to rest on top of or near their predecessors. There were accepted and stored twelve hundred sixty bags on August 10, six hundred thirty bags on August 11, and six hundred sixteen bags on August 12. On the night of August 12 and the morning of August 13, the center of hurricane "Connie" passed to the west of Baltimore and, as a result, the tides were abnormally high and water flooded the harbor end of pier 15, although it did not affect the shore end, and many of the bags of quebracho extract were damaged.

Belt's says that the hurricane and the resulting high tide were acts of God. It admits that an act of God does not exonerate it from liability if damage was caused in whole or in part by its negligence, but argues that it was not negligent because it was entitled to rely, and did rely, on reports from the weather bureau that indicated that the tide, at its height, would be a foot or more below the floor of the warehouse. It cites cases such as *Merchants Ice & Cold Storage Co. v. United Produce Co.* (Ky.), 131 S. W. 2d 469, and *Farr Co. v. Union Pacific Railroad* (10th Cir.), 106 F. 2d 437, where the evidence was that the company could reasonably have relied on, and in fact did rely on, predictions of the weather bureau which were upset by unprecedented water heights and there was nothing to show that there had been previous similar invasions of the warehouse or any other warnings that should have caused the warehouseman, as a prudent operator, to anticipate what did in fact occur.

We think the evidence in the case before us is different to a degree that renders the cases relied on by appellant to be distinguishable and not persuasive. It permitted the jury to find (1) that Belt's officials knew of previous high tides

which had invaded pier 15 or had lapped at its floor boards, and (2) that they did not in fact rely on the predictions of the weather bureau as to the course of "Connie" or as to the height of the tides. There was testimony to show that in the storm of August, 1933, water came into pier 15 and that it also came in during a storm in 1954, although this is disputed by Belt's, which says that on the latter occasion it was only within two or three inches of the floor. In his charge to the jury, the trial court stated several times, in summing up the evidence, that, including the 1955 occurrence, there had been three times in twenty-three years in which water had come into pier 15, and there was no exception to the charge on this point. There was testimony that Belt's manager and his assistants were apprehensive all during the week of August 7 about the possibility of pier 15 being flooded, that they knew that the tides, from time to time in storms, had been higher than forecast by the weather bureau. It can be inferred from the testimony that they realized fully what was manifest from the weather bureau reports, that the course of a hurricane is difficult, if not impossible, to predict very far in advance, and that the height of the accompanying tide at any given place depends on the relation of that place to the center of the hurricane and on other factors which cannot be precisely predicted. The evidence permitted a finding by reasonable men that Belt's officials contemplated the definite possibility that water would come into pier 15 when the storm struck but that they felt they could do nothing about it. The manager of the company testified: "* * * all during the week we were very much concerned about Hurricane 'Connie'. We were always surveying the situation as to what could possibly be done. * * * The particular quebracho extract, of course, posed a big problem in that there was no other place in the warehouse for it to be put. * * * We made a decision on each commodity that was on that pier, and the only decision we could come to on the quebracho extract was that we couldn't do anything about it. We were hoping that the tide would not come up * * *." He was asked whether he was apprehensive about the warehouse being flooded in storms, and his answer was: "We were always very much

apprehensive in storms." He was then asked if he had not decided whether there was nothing that could be done as far as the quebracho extract was concerned if the tide did rise too high. His answer was: "We kept following the reports in the newspapers, and on the radio, and our hopes went up and down with those reports. But we had no place to move this particular block of merchandise." He was then asked why he had not left the quebracho extract in the railroad cars that came in the week beginning Sunday, August 7—the week of their apprehension—and the answer was that although he and the superintendent and other people in charge were "very conscious of this threat, we still had to operate a warehouse and still had cars to unload and deliveries to make" and that if the extract had been left in the railroad cars, the warehouse company would have had to pay demurrage on it. The evidence pointed up the fact that during the week of August 7, over three thousand bags were placed on pier 15 on top of, or to the shore side of, the four thousand that had been stored there the previous week, so that any possibility of moving the bags first stored was completely nullified.

In our view there was sufficient evidence of the negligence of Belt's to have required submission of the issue to the jury. In *Merchants and Miners Transportation Co. v. Story*, 50 Md. 4, 16, 17, the Court affirmed a judgment for the appellee against the appellant which was found to be acting as a warehouseman for the storage of books which were damaged by water that flooded its wharf during a rainstorm of unusual violence. The Court said: "But there is evidence in the record showing that at other times the water had risen within a few feet of the floor of the wharf, and on one occasion at least during a storm accompanied by a south-east wind, three-fourths of the wharf was submerged, and a rise of a *few inches* more would have brought the water upon that part of it where the boxes containing these books were placed * * *." The Court said further, in commenting on the evidence: "It thus appears, that the danger did not come unannounced or in the night, but that there was timely notice given of its approach in the morning, and that the water was gradually rising while the storm was increasing in violence,

and yet no assistance was procured nor any effort made to obtain it, and no watchfulness or judgment exercised as to the probable effect of the wind and tide * * *. In view of these facts and reasonable inferences, we cannot say the court was in error in rejecting these prayers of the defendant, nor does it seem to us to be such an exceptional case as would have justified the court in saying there was *no evidence* of negligence, and in taking the case from the jury on that ground." Other authorities holding that damage caused by an act of God will not be excused as a matter of law if there was evidence that the defendant contributed to the damage in whole or in part by his negligence, include *Hecht v. Boston Wharf Co.* (Mass.), 107 N. E. 990; *New Brunswick Steamboat Company v. Tiers, et al.,* 24 N. J. Law 697; *Nitro-Phosphate and Odam's Chemical Manure Co. v. London and St. Katharine Docks Co.,* 9 Ch. Div. 503. See also 56 *Am. Jur., Warehouses,* Sec. 136; 93 *C. J. S., Warehousemen and Safe Depositaries,* Sec. 42.

The appellant contends that the court erred in refusing to charge the jury as requested in two prayers which it had offered. The court rejected all prayers offered by both sides and charged the jury orally. We think the point was not preserved below and is not properly before us under the rules. At the conclusion of the court's instructions, appellant's counsel said: "I would like to request that our instructions five and four be given." The court answered: "I think I have covered everything there in what I have said" and counsel answered: "Thank you, sir." Rule 554 d of the Maryland Rules (formerly Part Three, III, Rule 6(c), of the General Rules of Practice and Procedure) provides that before the jury retires to consider its verdict, any party may object to any instruction given in the charge or any omission therefrom or to the failure to instruct on any point "* * * stating distinctly the portion or omission or failure to instruct to which he objects and *the specific grounds of his objection.*" Paragraph e of Rule 554 (formerly Part Three, III, Rule 6(d) of the General Rules of Practice and Procedure) restricts the party on appeal to (1) the particular portion of the instruction given or the omission or the particular failure to instruct,

and (2) "the specific grounds of objection *distinctly stated at that time*" and no other errors or assignments of error in the instructions shall be considered by the Court of Appeals. (Emphasis supplied.) We think the reference to the instructions by number, without a statement of the specific grounds of objection distinctly stated at the time exception is taken, is not a compliance with the rules and that appellant's contentions on this point may not be reviewed. *Ritterpusch v. Lithographic Plate,* 208 Md. 592; *Washington Suburban Sanitary Commission v. Musgrove,* 203 Md. 231, 237. The appellant has lost nothing by failing to comply literally with the rules because in our opinion the court's charge adequately and fairly instructed the jury as to the law and appellant, on the evidence, was not entitled to the instructions it asked.

*Judgment affirmed, with costs.*