## JONES, ET AL. v. FEDERAL PAPER BOARD COMPANY, INC., ET AL.

[No. 40, September Term, 1968.]

476

 

 

 

 

 

*Decided February 25, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, SINGLEY and SMITH, JJ.

*Harry Goldman, Jr.,* with whom were *W. Robert Benson* and *John P. Greenspan* on the brief, for appellant.

*Phillips L. Goldsborough, III,* with whom were *Theodore B. Cornblatt* and *Smith, Somerville & Case* on the brief, for Federal Paper Board Company, Inc. and Wayne L. Cumbee, part of appellees.

*Hamilton O'Dunne* with whom was *Patrick A. O'Doherty* on the brief, for John B. Leary, another appellee.

BARNES, J., delivered the opinion of the Court.

This appeal was taken by the plaintiffs below, Robert W. Jones (Robert), Ian C. Jones (Ian), both infants by their father and next friend, William L. C. Jones (William) and by William, individually, from judgments of $5,000 in favor of Robert, of $200 in favor of Ian and of $1,500 in favor of William entered in the Circuit Court for Baltimore County (MacDaniel, J.) against the defendant, John B. Leary (Leary), only, upon verdicts of the jury. The jury returned verdicts in favor of the other defendants, Federal Paper Board Company, Inc. (Federal), a corporation of the State of New York, and Wayne L. Cumbee (Cumbee), the operator of the tractor-trailer owned by Federal which was involved in the collision with Leary's automobile, in which Robert and Ian were passengers in Baltimore County at the intersection of York Road and Middletown Road shortly before 8:00 a.m. on February 25, 1965.

An action was originally filed on behalf of Robert and Ian by William as their father and next friend, and by William individually, against Federal and Cumbee. A third-party claim was then filed by those defendants against Leary. An amended

declaration was later filed by the plaintiffs joining Leary as a defendant. Leary and his infant son, Charles E. Leary, filed an action against Federal and Cumbee and the two cases were consolidated for trial.

York Road (Maryland Route 45), at its intersection with Middletown Road, is 24 feet wide and has two lanes of traffic running north and south. Middletown Road consists of two lanes of traffic running east and west and is 22 feet wide. Both of these roads have a surface of black top macadam. On York Road, approximately 117 feet north of the southern boundary of Middletown Road there is a steep hillcrest. There were three signs facing drivers going south on York Road toward the hillcrest. One sign posted the speed limit at 30 miles per hour. Another sign contained the word "SLOW". The third sign indicated the presence of an intersection just beyond the hillcrest. The speed limit for southbound traffic on York Road remained at 30 miles per hour until approximately three-eighths of a mile south of Middletown Road.

At the time of the accident the road was wet. It had been raining just prior to the accident but the rain had stopped shortly before 8:00 a.m. Cumbee was operating a tractor-trailer unit owned by Federal, in a northerly direction on York Road. The vehicle weighed approximately 25,000 pounds, and was carrying a cargo weighing approximately 15,000 pounds, a total of approximately 40,000 pounds. The tractor was 7 feet 9 inches high and the height of the trailer was 12 feet 4½ inches. Five orange lights were operating across the top of the cab, in addition to six lights on the trailer and two parking lights on the front of the tractor. Cumbee intended to make a left turn from York Road into Middletown Road. To accomplish this, he had to enter Middletown Road at an angle, with part of the truck crossing the southern lane of Middletown Road. He testified that when he reached a point 5 to 10 feet south of Middletown Road, he brought the tractor-trailer to a complete stop in the northbound lane of York Road with his left directional signal in operation. The vehicle remained stopped for about 5 seconds, while Cumbee checked both roads for any approaching traffic. He could see up York Road to the north as far as the hillcrest, but could not see beyond the hillcrest. Observing no traffic, he

started ahead and began to turn the tractor-trailer slowly across the center line of York Road. When the left front of the tractor was 2 or 3 feet across the center line of York Road, Cumbee saw an automobile being driven south on York Road by Leary come over the hill at a speed in excess of 40 miles per hour. Cumbee stopped his vehicle immediately, but Leary came straight down the hill toward him. Leary did not decrease his speed and made no attempt to swerve around the stopped tractor. Within a few seconds after Cumbee saw the Leary automobile, the two vehicles collided at a point 5 feet west of the center line of York Road and 7 feet north of the south side of Middletown Road.

Leary, who was a teacher at the Hereford High School, testified that he was thoroughly familiar with York Road and the vicinity of the accident, inasmuch as he travelled the route every day to and from his place of employment. He also testified that he knew that the speed limit was 30 miles per hour and knew of the sign indicating the intersection of York Road with Middletown Road. He also knew that trucks frequently made turns at this intersection and that he might have to stop for one of those trucks. He stated that he decreased his speed as he came over the crest of the hill and that when he came up on the crest of the hill, he saw Cumbee's tractor which was then stopped on the north side of York Road. He was able to see the entire tractor-trailer at that time. He then put his foot on the accelerator of his Ford Falcon automobile and increased the speed of his car to 35 or 40 miles per hour. When he had driven half-way down the hill toward the tractor, a distance of approximately 52 or 53 feet, he stated that he saw the Cumbee vehicle make a jumping or bucking movement across the center line of York Road. He then attempted to apply his brake, but was uncertain whether he was actually able to slow down his car before the collision. He stated that both vehicles were moving at the time of the collision. The cost of repairing Leary's vehicle was $961.22.

The investigating police officer found debris located under the front bumpers of the vehicles which indicated that they did not move from the point of impact. The officer testified that Leary stated that he had been travelling at a speed of between

35 and 40 miles per hour. He told the officer that "he came over the hill and the truck was there and they collided."

Howard Kroder, who had lived at York Road and Middletown Road in Parkton for five years and who was a disinterested eye witness to the accident, testified that he saw the tractor-trailer stop on York Road in the northbound lane and then proceed a short distance across the center line and stop again. A few seconds later, he saw Leary's vehicle pop over the hill "like a shot out of a cannon," proceed down the hill and collide with the stopped truck. The truck did not move at all from the time the Leary vehicle came over the hill until the collision occurred. Kroder estimated that Leary was travelling at a speed of at least 40 miles per hour when he came over the crest of the hill and stated that Leary did not slow up prior to the collision. Kroder further testified that Leary made no effort to drive around the stopped truck, even though there was ample room for him to do this. After the collision, Kroder heard Leary state that he was driving fast because he was going to be late for work.

John Vandervat, an investigator who had interviewed Kroder for Cumbee and Federal, was subpoenaed and called as a witness for Leary. Counsel for Leary demanded that Vandervat produce his memorandum in regard to his interview with Kroder and this memorandum was then read into evidence. The memorandum indicated that Kroder had witnessed the accident; that Cumbee's truck had stopped before turning to the left; that no southbound vehicles were visible when Cumbee began his left turn; that the truck then stopped again with its left front only a short distance over the center line, after which the Leary vehicle came over the crest of the hill "like a bat out of hell. He was flying." The memorandum further indicated that Leary did not slow down, apply his brakes or seek to avoid hitting the truck; that he went straight ahead and struck the left front of the stopped truck with the front of his automobile. The memorandum further indicated that Kroder's opinion was that the accident was solely the fault of Leary who was known as an extremely fast driver. It stated, "The kids are always talking about him flying very low and wanting him to get an airplane."

The plaintiffs introduced a profile plat into evidence for the purpose of indicating sight distance, based upon aerial photography, but no actual measurements were made at the scene of the accident to test its accuracy. This plat indicates that Cumbee's sight distance of the white top of Leary's automobile would be approximately 310 feet.

Leary and his son Charles, who was on the front seat with him, were both wearing seat belts and were saved from serious personal injuries. There were no seat belts for rear-seat passengers and Robert and Ian were thrown with substantial force resulting from the impact against the rear of the front seat. Ian claims that he suffered a "broken arm"; the x-rays showed "some cortical irregularity which may represent an incomplete fracture without displacement." An x-ray taken a month and one-half after the accident failed to indicate any evidence of a fracture. Ian was required only to wear an elastic bandage and the arm was soon completely healed. He was back in school the day following the accident.

Robert, however, was more seriously injured. Blood from his face poured down the rear of the back seat and he was knocked unconscious. His nasal bone was broken and his upper jaw bone was comminuted, the broken pieces being visible in the puncture wound through the floor of his nostril. There was a fracture of the maxilla under the upper lip and several of his front teeth were dislodged, so that root canal therapy and capping were required. The injury healed well, and at the trial, Robert's only complaint was that his nose was more pugged than it had been prior to the accident. Testimony on his behalf indicated that Robert was unable to resume his normal physical activities until August of 1965. He did not return to school until September of that year, being tutored in the meantime at home. There was evidence, however, that he was playing normally 3 or 4 weeks after the accident. Dr. C. Adam Bock, a well known dentist and oral surgeon in Baltimore City, a past president of the Baltimore City Dental Society, past president of the Maryland Dental Society and past president of the American Society of Oral Surgeons, and whose practice is now limited to oral surgery, examined Robert for the defendants on June 9, 1967. He found that Robert's treatment for the injuries to his

teeth had been successful, that there was no evidence of any fracture of the maxilla from the x-ray examination and that there was no evidence of any malformation or deformity of either the maxilla or the mandible. There was also evidence that Robert had difficulty with his teeth and gums prior to the accident; that he was susceptible to dental cavities, including cavities in his front teeth. The life expectancy of his teeth would have been shortened even if the accident had not occurred. There was also evidence that Robert's facial features were not changed as a result of the accident.

Counsel for the plaintiffs submitted a number of requests for instruction, and also made a motion to take judicial notice of a charge to a jury in another case, all of which were denied by the trial court. The trial court gave a comprehensive charge to the jury to which the plaintiff excepted in several regards, hereinafter considered. After the verdicts already mentioned, the plaintiffs filed a motion for a new trial which the trial court overruled. From judgments on those verdicts, the present appeal was timely taken.

The plaintiffs raise five questions before us: Did the trial court commit error prejudicial to the plaintiffs—

1. In its instructions to the jury in regard to damages?

2. In not taking judicial notice of its charge in a prior case in which 7 of the 12 jurors in the present case had been instructed, and in not giving a closely similar charge in the present case?

3. In either not directing a verdict in favor of the plaintiffs against Federal and Cumbee on the issue of liability or in failing to charge the jury that these defendants were prima facie negligent?

4. In failing to grant the plaintiffs leave to present certain voir dire questions?

5. In permitting allegedly improper argument by counsel for Leary?

We find no prejudicial error in the rulings of the trial court and will affirm the judgments.

We will consider the five questions in the order mentioned, and will refer to any additional facts and portions of the trial

court's charge to the jury as may be deemed necessary for such consideration.

1.

After certain general observations and statements in regard to preponderance of the evidence and burden of proof both in regard to primary and contributory negligence, the trial court instructed the jury as follows:

> "Remember the burden of proof stays with the plaintiff as to every element of the case; that is to say, to persuade you that the defendant was guilty of negligence, to persuade you precisely what the injuries were, what the expenses were, what his pain and suffering were, just as the burden stays with the defendant all the way through to show that the plaintiff is guilty of contributory negligence.
>
> "So, you should not speculate or conjecture about any element of this case. You should not speculate as to what may or may not happened, as to what the plaintiff's injuries may or may not have been, but you must decide on it from what you have heard from the witness stand and the exhibits which you have seen."

Then after a further instruction in regard to contributory negligence and a definition of negligence, with an instruction that the verdict must be unanimous and that the jury should consider the evidence in its entirety as to both parties, the trial court instructed the jury:

> "If you should find for the plaintiff, then, in considering and estimating the damages you are entitled to take into consideration the state of health and physical condition of the plaintiff prior to his injuries and the consequence of his injuries. You should consider the physical and mental suffering and disfigurement to which he may have been subjected as a result of injuries as well as medical expenses and other monetary losses incurred as a result of the injuries to which he has been subjected; and you shall consider whether or not those injuries are permanent and how far, if

at all, they are calculated to disable him from engaging in those activities and occupations for which, in the absence of such injuries, he would otherwise have been capable of engaging. Taking into consideration those matters, you should award, if you find in his favor, to the plaintiff such damages as in your opinion will be fair and just compensation for the injuries, expenses, and losses which you may find he has sustained as a consequence of the accident.

"You are to keep in mind that these damages are to be just exactly what I have said, that is, fair and just compensation. They are not to be of a punitive nature, they are not intended to punish the defendant, are not intended to reward the plaintiff; they are intended to be fair and just compensation for his injuries and expenses.

"You are instructed that the amount of damages to be awarded, if any, is to be based solely upon the evidence in the case, and the amounts claimed by the plaintiff in the declaration or claimed by his attorney in argument are not evidence and are not to be considered in any way as a measure of the damages, if any, to which the plaintiff may be entitled."

The plaintiffs and appellants particularly object to the use of the word "precisely" in the first sentence of the portion of the charge above quoted and earnestly argue that it puts an untenable burden on them to prove the damages, including the pain and suffering, with precision.

The Maryland law is well established that the trial court's instructions to the jury must be read as a whole and that it is not permissible to take isolated portions of the charge which may contain inartificial methods of expression, when the charge, considered as a whole, fairly presents the case to the jury on the issues presented by the evidence in the case. As Judge (now Chief Judge) Hammond stated, for the Court, in *West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A. 2d 17 (1953), in commenting on the charge of the trial court in that case in regard to damages:

"We think that the trial judge fairly presented the

issues which the evidence required to be submitted to the jury. The charge must be considered as a whole and not condemned because isolated portions of it do not seem to do justice to one side or the other, nor because of the method of expression. Fisher v. Baltimore Transit Co., 184 Md. 399, 402; Larkin v. Smith, 183 Md. 274; Reindollar v. Kaiser, 195 Md. 314. As Judge Marbury said for the court in Bull Steamship Lines v. Fisher, 196 Md. 519, 529: "The purpose of oral charges is to tell the jury in simple words what the law is in a case before them, and we will not be too particular in criticizing the words used if the result is sufficient.'" (203 Md. at 250-51, 100 A. 2d at 20.)

*West* was cited with approval and followed by the Court in *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 143 A. 2d 627 (1958), in which Judge Horney, for the Court, stated:

"If the original and amended instructions are read together as we read them, we think it is clear that the charge as a whole contains a fair statement of the law with respect to damages in a case such as this. See *West v. Belle Isle Cab Co.*, 203 Md. 244, 100 A. 2d 17 (1953). The law on the subject was fairly covered by the instructions in the present case, and that is all the rule requires. We have repeatedly stressed the fact that we cannot put the 'trial judge in a strait jacket and prescribe or adopt a formula to be used and followed by him,' with respect to his instructions to the jury. *State, use of Taylor v. Barlly*, 216 Md. 94, 140 A. 2d 173 (1958), and cases therein cited." (217 Md. at 612, 143 A. 2d at 634.)

In our opinion the instructions of the trial court, taken as a whole, do not mean, and the jury could not reasonably have thought they meant, that the plaintiffs were required to prove their damages with mathematical exactness. The trial court meant simply that the plaintiffs had the burden of proving their damages beyond mere conjecture and speculation and that the jury's verdict must be based upon the evidence and the appli-

486

cable law. See *Adams v. Benson,* 208 Md. 261, 271, 117 A. 2d 881, 885 (1955).

But, say the plaintiffs, the trial court "overloaded its charge with Cautionary Instructions" which had the prejudicial effect of diminishing the damages of the plaintiffs. We do not agree with this argument. On the contrary, in our opinion, the cautionary instructions were proper in view of the controversy between the parties in regard to damages and particularly in regard to whether or not (1) a pre-existing condition of Robert's teeth caused or contributed to the then existing condition of his teeth, (2) there was any disfigurement of Robert's nose and face, and (3) there was any fracture of Ian's arm. Under these circumstances, it was appropriate for the trial court to give the cautionary instructions already mentioned. As Judge Parke, for the Court, aptly stated in *Riley v. Naylor,* 179 Md. 1, 16 A. 2d 857 (1940), referring to cautionary instructions in regard to damages:

> "While the accent is on the variety and scope of the elements that may be considered, the prayer requires that every form of the permitted damages is in proximate causal connection to the injuries sustained. The adaptability of this instruction to various and numerous conditions requires general and flexible terms, which acquire their requisite measure of certainty by the necessity of their nature and certain relation to particular wrongful injuries. It is, therefore, helpful and permissible that a larger measure of definiteness be given by other cautionary instructions to inform the jurors more specifically the circumscribed mode and boundaries of their award of damages." (179 Md. at 7, 16 A. 2d at 860.)

We find no error in the instructions, considered as a whole, in regard to damages.

2.

The verdicts in this case were rendered on October 4, 1967. After a motion for a new trial filed by the plaintiffs was overruled by the trial court on October 17, judgments were entered upon the verdicts the same day. On October 31, some fourteen

days after the judgments were entered, the plaintiffs filed a motion requesting the trial court to take judicial notice of the docket entries, jury list and charge to the jury in the case of *John F. Jacobs, to his own use and to the use of the Baltimore Gas and Electric Company, and Eunice Jacobs vs. Charles Gladding, Inc.,* Circuit Court for Baltimore County, At Law, 65067/100/79, stating as grounds therefor that 7 of the 12 jurors in the present case had been jurors in the *Jacobs* case in which the sole issue was damages due to negligence, that the charge in regard to damages was far more favorable to the plaintiffs in that case than was the charge in regard to damages in the present case, and that the trial court had granted leave to counsel for the plaintiffs to argue at the motion for the new trial the disparity of the two charges. The trial court on November 9 overruled the motion of the plaintiffs and thereafter on the same day, the plaintiffs entered their appeal to this Court.

There is nothing in Maryland Rule 826 c, "Contents of Record" (on appeal) which provides for the inclusion of records of other cases which were not made part of the record in the trial court. There was no error in the trial court's overruling of the plaintiffs' motion made two weeks after the judgments had been entered in the case and the portions of the record in the *Jacobs* case are not before us in this appeal.

In any event, it seems clear to us that the trial court was not obliged to use in this case the identical words in the charge given by the trial court in the *Jacobs* case. There was no attempt to show that the jurors were misled or confused by the lack of exact verbal uniformity in the two charges or that the jurors awarded the plaintiffs less damages than they otherwise would have awarded because of this. There was no showing that the evidence in the *Jacobs* case presented the identical issues as those in the instant case. Indeed, the plaintiffs' motion indicates that the liability was conceded in *Jacobs,* whereas in the present case there was a controversy in regard to whether the Learys, as plaintiffs, were entitled to recover damages at all.

Moreover, an examination of the two charges indicates that the *substance* of the instruction in regard to damages was the same; the difference between the charges was in form and in the language used. Trial courts have never been required to use

identical charges in different cases and it would be most unlikely that any two cases between different parties involving different accidents would make an identical instruction in the two cases appropriate. See *Casey v. Roman Catholic Archbishop*, *supra* and *West v. Belle Isle Cab Co.*, *supra*. We find no error in the trial court's overruling of the plaintiffs' motion to take judicial notice or in not having used identical language in the charge in regard to damages· in the present case as the trial court used in the *Jacobs* case.

### 3.

The appellants contend that the trial court erred in either (a) not directing a verdict in favor of the plaintiffs against Federal and Cumbee on the issue of liability or (b) in failing to charge the jury that those defendants were, prima facie, guilty of negligence.

### (a)

In regard to the alleged refusal of the trial court to direct the verdict in favor of the plaintiffs against Federal and Cumbee, no motion for a directed verdict was filed on behalf of the plaintiffs during the trial. The plaintiffs did submit a request for instruction (Plaintiffs' Request for Instruction No. 3) which would have directed a verdict against Federal, but no reasons in support thereof were stated in the requested instruction, and the record fails to disclose that any reasons were given orally to the trial court in regard to it. Maryland Rule 552 (a) mandatorily requires that a motion for a directed verdict "shall state the grounds therefor." Plaintiffs' Request for Instruction No. 3 cannot, therefore, be considered as a motion for a directed verdict which complies with Maryland Rule 552 a and, under these circumstances there is nothing before this Court to review on this issue. As Judge McWilliams, for the Court, stated in *Glover v. Saunders*, 252 Md. 102, 249 A. 2d 156 (1969), quoting from the opinion in *Rockville Investment Corp. v. Rogan*, 246 Md. 482, 484, 229 A. 2d 76, 77 (1967) :

"There is nothing before this Court to review. After making its motion for a directed verdict at the close of appellees' case, which motion was denied, appellant offered evidence to support its theory of the case and

to rebut the evidence presented by appellees. The motion for directed verdict was withdrawn by the appellant's presentation of evidence. Maryland Rule 552 b. *Schmidt v. Millhauser,* 212 Md. 585, 130 A. 2d 572; *Smith v. Carr,* 189 Md. 338, 56 A. 2d 151. At the close of all the evidence appellant made a motion for a directed verdict without stating the grounds therefor, as he had done previously for the motion made at the close of the evidence offered by appellees. The record indicates that there was argument on this motion, but it does not reveal any portion of that argument nor the grounds for this motion. A party has the obligation to state for the record the grounds of his motion for a directed verdict in order to inform the court and the counsel for the nonmoving party. Rule 552 a; *Levin v. Cook,* 186 Md. 535, 47 A. 2d 505; *Slaska v. Idzi,* 186 Md. 530, 47 A. 2d 503, and cases cited therein. The second motion was defective, and having failed to properly renew the first motion and the reasons therefor, appellant can not now rely upon either on appeal. Appellant also failed to object to any instructions given the jury. Since appellant offered evidence after making its motion for a directed verdict at the close of appellees' testimony, but failed to properly renew the motion at the close of all the evidence or to object to instructions with reference to the issues raised in the trial, the rulings on the motions and the instructions to the jury became the law of the case and the questions raised by the appellant are not properly before this Court for decision. *Montauk Corp. v. Seeds,* 215 Md. 491, 138 A. 2d 907; *Smith v. Carr, supra."*

See also *Edwards v. Chisolm,* 246 Md. 542, 548, 229 A. 2d 404, 407 (1967).

In any event, we would not have found the trial court to have been in error in refusing such a motion if it were properly before us, as the facts, and all reasonable inferences from those facts, taken most favorably to Federal and Cumbee, make it clear to us that the issue of negligence as to them was properly a jury question.

## (b)

The appellants further contend that the trial court erred in refusing Plaintiffs' Request for Instructions 13, 14 (thesis 3) and 18 in regard to (1) charging the driver with notice of such conditions on the highway as he should have seen, (2) the requirement of Article 66½, Section 217 requiring drivers to keep to the center of the roadway and if a driver fails to do this, it would be, prima facie, evidence of negligence, and (3) the driver, Cumbee, in making a left turn, was required to leave the intersection to the right of the center line of Middletown Road.

Here again there is nothing before us for review on these issues inasmuch as the plaintiffs failed to state the grounds of objection at the conclusion of the trial court's charge to the jury and merely made reference to the number of the requests for instructions they thought should be granted.

Maryland Rule 554 (d) specifically requires a party who has an objection to any portion of an instruction given, or omission therefrom "or to the failure to give any instruction" to make such objection before the jury retires "stating distinctly the portion, or omission, or failure to instruct to which he objects *and* the *ground of his objection.*" (Emphasis supplied.)

Maryland Rule 554 (e) then provides:

> "Upon appeal a party in assigning error in the instructions, *shall be restricted to* (1) the *particular portion* of the instructions given or the *particular omission* therefrom or the *particular failure* to instruct *distinctly objected to* before the jury retired and (2) the *grounds of objection distinctly stated* at the time; and *no other errors or assignment of error* in the instructions *shall be considered* by the Court of Appeals."
> (Emphasis supplied.)

We held in *Shafer v. Bull,* 233 Md. 68, 194 A. 2d 788 (1963), that mere references to the numbers of an instruction which the trial court has declined to grant is not a compliance with the mandatory requirement of Maryland Rule 554 d and any issue in regard to their refusal is not preserved for consideration on appeal. As Judge Sybert, for the Court, stated in *Shafer*:

> "The second contention of Shafer Brothers [the ap-

pellants] is that it was error to fail to grant their fourth requested instruction dealing with contributory negligence. The only exception made to the denial of this instruction was as follows: 'Shafer Brothers further except to the failure of the Court to grant their request for instruction Nos. 3, 4 and 5.' The issue thus raised is not properly reviewable. We have held that a reference by a party to an instruction by number, unless accompanied by an objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the specific ground of his objection, is not a sufficient compliance with Rule 554 d, *Belt's Wharf v. Internat. Corp.,* 213 Md. 585, 132 A. 2d 588 (1957)." (233 Md. at 75, 194 A. 2d at 792.)

We cited *Shafer* with approval and followed it in *Bauman v. Woodfield,* 244 Md. 207, 222, 223 A. 2d 364, 372 (1966).

Here again, however, if the issues raised by the refusal by the trial court to grant the instructions mentioned were properly before us, we would not have concluded that there was any error in their refusal.

Requested Instruction 13 stated that a driver is charged with notice of such conditions and motor vehicles along the road as he should have seen is merely the statement of an obvious general proposition of law which was implicit in the trial court's charge in any event. *Victor Lynn Lines, Inc. v. State,* 199 Md. 468, 87 A. 2d 165 (1952), mentioned in the request for instruction as the case supporting it is not authority for holding that a *refusal* of such an instruction in this case was reversible error, as the Court in the *Victor Lynn* case merely held that it was not error for the lower court to have instructed the jury using such language.

Requested Instruction 18, relying on Code (1957), Article 66½, Section 217, which requires drivers to operate their vehicles on the right side of the highway, was not appropriate for the present case involving a left-hand turn at an intersection. The left-hand turn is governed by Article 66½, Section 232 which requires the turning driver to yield the right-of-way to a vehicle approaching from the opposite direction which is with-

in the intersection or so close to the intersection as to constitute an immediate hazard. The trial court, in our opinion, properly instructed the jury on this aspect of the case as follows:

> "You are further instructed that the driver of a vehicle within an intersection, intending to turn to the left, shall yield the right of way to a vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard."

Finally, the trial court did not, in our opinion, err in declining to instruct the jury that Cumbee in making a left turn was required to leave the intersection to the right of the center line of Middletown Road, relying on Article 66½, Section 225 (b) and our decision in *Radcliffe v. Texas Supply Co.*, 194 Md. 117, 69 A. 2d 813 (1949). As pointed out in the opinion in *Radcliffe*, however, Section 225 (b) does not require "a vehicle to round the center point." (194 Md. at 121, 69 A. 2d at 815), and further that because a truck may enter a roadway to the left of the center line may not be regarded as the proximate cause of an accident like the one involved in the case at bar inasmuch as the truck's position would have afforded Leary, the driver of the approaching vehicle, more room in which to stop or swerve.

### 4.

The appellants fourthly contend that the trial court erred in declining to present to the jury five voir dire questions, as follows:

> "1. Are any of you employed by or stockholders of an insurance company which is engaged in the casualty insurance business?
>
> "2. Are any of you engaged in the general insurance agency business, or any of you an agent for a casualty insurance company?
>
> "3. Have any of you ever worked as a claims investigator or insurance adjustor?
>
> "4. Have any of you read any articles or advertising in periodical publications which tend to indicate a

relationship between the amounts of personal injury verdicts and increases in insurance premiums?

"5. (If the answer of any juror to the above questions is in the affirmative, answer the following question.)

"Notwithstanding any opinion which you might have formed regarding the subject of the advertising or articles just mentioned, would you be able to decide the question of liability and damages in this case solely on the evidence and the law, without being influenced by such an opinion?"

The appellants argue that the refusal of the trial court to propound these voir dire questions denied the appellants a fair trial before an impartial jury relying on the Maryland Constitution, Article XV, Section 6 guaranteeing the right of trial by jury in civil cases and in Amendments VII and XIV of the Federal Constitution, and principally on the decisions of the Third Circuit Court of Appeals in *Kiernan v. Van Schaik*, 347 F. 2d 775 (1965), in which, in commenting on the rule against the disclosure of insurance in personal injury cases, Circuit Judge Freedman stated for the Third Circuit:

"It is based on the desire to assure a fair trial to a defendant, and it may not be permitted to destroy the plaintiff's equal right to a fair trial. A fair trial for a plaintiff in an accident case presupposes the right to a *voir dire* examination without any crippling limitations imposed by an over-extension of the rule against disclosure that the defendant is insured. That men will be prone to favor that side of a cause with which they identify themselves either economically, socially, or emotionally is a fundamental fact of human character." (347 F. 2d at 781.)

and, accordingly, held that the counsel for the plaintiff should have been allowed on voir dire to question prospective jurors as to their interests in or associations with insurance companies, notwithstanding the rule against disclosure of insurance in personal injury cases.

It is well established in Maryland that " 'the extent of examination of prospective jurors rests within the sound discretion of the trial court.' " *Mason v. State,* 242 Md. 707, 709, 218 A. 2d 682, 683 (1966) quoting with approval from and following *Yopps v. State,* 234 Md. 216, 222, 198 A. 2d 264, 267 (1964). Moreover, we have held that it is improper in this State to inject into the trial of a personal injury case a suggestion that the defendant is covered by insurance except in three limited situations. As we stated in *Snowhite v. State,* 243 Md. 291, 301-02, 221 A. 2d 342, 348 (1966) :

> "In *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 143 A. 2d 627 (1958) we quoted with approval from *McCormick on Evidence* (1954) §168, which pointed out that there was a group of exceptions to the general rule. The Maryland cases indicate the following exceptions :
>
> "1. Where the evidence is relevant to the cause of the accident or the liability of the defendant. *Takoma Park Bank v. Abbott, supra.*
>
> "2. Where the reference to insurance is made by the defendant or his witness, in which event the testimony is admissible and is subject to legitimate comment and argument. *Takoma Park Bank v. Abbott, supra.*
>
> "3. Where the evidence is relevant to an issue of which of two or more defendants was the employer of the operator of the vehicle involved. *Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 134 A. 2d 296 (1957)."

It is clear that in the light of our decisions, the trial court did not abuse its discretion in declining to ask the jury the voir dire questions in regard to affiliation with insurance companies.

*Kiernan v. Van Schaik, supra,* has not been followed by subsequent federal cases. See *Hinkle v. Hampton,* 388 F. 2d 141, 144 (10th Cir. 1968) and *Langley v. Turner's Express, Inc.,* 375 F. 2d 296 (4th Cir. 1967). In *Langley,* Circuit Judge Craven for the Fourth Circuit stated :

> "We must strike a balance between the probability

of danger to plaintiffs that someone sympathetic to insurance companies may remain on the jury and the danger to defendant that the jury may award damages without fault if aware that there is insurance coverage to pay the verdict. We think that the latter danger is greater than the former, and are not persuaded otherwise by *Kiernan v. Van Schaik,* 347 F. 2d 775 (3rd Cir. 1965)." (375 F. 2d at 297.)

We agree with the decisions in *Hinkle* and *Langley,* which are in accord with our decisions in this area of the law and not with the decision in *Kiernan.*

### 5.

The final contention of the appellants is that the trial court erred in limiting the argument of plaintiffs' counsel to the jury and in allowing counsel for the defendant Leary the right to interrupt it.

Counsel for the defendants sought to deprecate the evidence of damages to Robert's teeth by evidence that the condition of his teeth was such that he might well have lost them prematurely regardless of the happening of the accident. Counsel for Leary, in his argument to the jury, referred to an x-ray exhibit used in the cross-examination of Dr. DiNardo. In the brief for the plaintiffs, counsel refers to this x-ray exhibit as having "been marked for identification and then withdrawn from evidence." The record, however, indicates that this x-ray exhibit *was offered and received into evidence* as Defendant Leary's Exhibit A. The record further shows that Dr. DiNardo was permitted by counsel for Leary to take this x-ray exhibit (which was one of his original records) with him at the conclusion of his testimony, but the record does not indicate to us that this exhibit was withdrawn from the evidence in the case. Inasmuch as Dr. DiNardo was cross-examined before the jury in regard to this x-ray exhibit which, as we have indicated, was introduced into evidence, we are of the opinion that it was not improper for counsel for Leary to refer to it in his argument to the jury. In any event, counsel for the plaintiffs did not object to the argument and reference to the x-ray exhibit and this point is not preserved for our consideration on appeal.

The plaintiffs argue, however, that when their counsel in his rebuttal argument to the jury sought to meet this argument by Leary's counsel by referring to other x-rays, he was interrupted by counsel for Leary who objected to the attempt of counsel for the plaintiffs to interpret the other x-rays on the ground that the doctor had not interpreted them and counsel was not competent to do this at that time. Counsel for Leary stated, "The x-ray I commented on was a little x-ray Dr. DiNardo brought in and took back." There was no objection made by counsel for the plaintiffs to this interruption by counsel for Leary to make an objection. The trial court then stated:

"The Court: You may show the x-rays to the jury but not interpret the x-rays.

"Counsel for the Plaintiffs: All right, I won't interpret them but you can draw whatever inference and conclusion you care to on those x-rays. They show what they show. If Your Honor pleases, I must respectfully except.

"Counsel for Leary: Except?

"The Court: Yes, he makes an exception."

It is clear to us that the trial court ruled correctly in not permitting counsel for the plaintiffs to interpret the x-rays. This requires professional medical skill and in the absence of evidence of their interpretation from a professional witness, it was proper to permit the exhibition of the x-rays to the jury without any interpretation by counsel for the plaintiffs.

Finding no prejudicial error in the rulings or instructions of the trial court, the judgments will be affirmed.

*Judgments affirmed, the costs to be paid by the appellants.*