SUNDRI ALIMCHANDANI *v.* ALICE L. GOINGS ET AL.

[No. 982, September Term, 1977.]

*Decided May 11, 1978.*

The cause was argued before Liss, Wilner and Couch, JJ.

*E. Dale Adkins, III,* with whom were *Anderson, Coe & King* on the brief, for appellant.

*Marvin Ellin,* with whom were *Ellin & Baker* on the brief, for appellees.

Liss, J., delivered the opinion of the Court.

Alexander Pope, in his "Moral Essays," Epistle III, to Allen Lord Bathurst, begins a poem in which he explores the effect

of avarice on mankind by posing the question, "Who shall decide when doctors disagree, and soundest Causists doubt, like you and me?" [1] We here supply the answer — not the judge, but the jury.

This case arises out of a five count declaration charging the appellant, Sundri Alimchandani (hereinafter Dr. Alim) and the Maryland General Hospital with medical malpractice.[2] The first count, brought by the estate of the decedent, Willie Goings, sought damages for his wrongful death and pain and suffering; the second through the fifth counts sought recovery of damages for his surviving wife, Alice L. Goings, and his three surviving daughters, Janet, Theresa, and Patricia. The case was submitted to the jury which returned verdicts in favor of the appellees under the various counts totaling more than a half-million dollars. It is from the judgments entered on these verdicts that this appeal is filed.

The decedent was a healthy, 28-year-old construction worker who entered Maryland General Hospital on February 24, 1975 for a routine tonsillectomy. The operation was performed the following morning by a Dr. Stitchel, who described the procedure as uneventful. The appellant was the attending anesthesiologist. The hospital chart shows that the anesthesia took effect at 8:35 A.M. and lasted until 9:45 A.M., at which time the decedent was removed to the recovery room. There was conflicting testimony as to whether the decedent was conscious, semi-conscious, or unconscious at the time of his removal to the recovery room. Prior to being transported from the operating room, the decedent was placed on a stretcher in a supine position and the endotracheal tube, which is used to deliver oxygen to a surgical patient, was removed. The decedent was delivered to the recovery room by Dr. Alim, who, after completing the anesthesia chart and checking his vital signs, left the decedent in the care of the recovery room personnel. At approximately 10 A.M. the decedent was discovered by a recovery room nurse in a near

1. The Poetic Works of Alexander Pope (Sir Adolphus William Ward Ed., 1964).

2. A directed verdict was entered against Maryland General Hospital at the close of all the evidence. Maryland General offered no evidence in defense and is not a party to this appeal.

sitting position with his head drooped over and his eyes closed. The nurse correctly concluded that the patient was in the throes of a cardio-respiratory arrest and summoned the other two recovery room nurses. After checking and finding minimal evidence of the patient's vital signs, the nurses attempted to deliver oxygen to the decedent's lungs by the use of a device consisting of a face mask and bag, known as an "ambu" bag. In the meantime, the hospital's emergency resuscitation team was summoned and succeeded in reviving the patient, but not until the temporary deprivation of oxygen to the brain had caused extensive brain damage. The patient remained in a coma for 12 days and then succumbed.

Appellant presents the following two issues for determination in this appeal:

I. Did the trial court err in instructing the jury that if it found that the decedent was entrusted to the recovery room staff, unconscious, without an artificial airway, and in a supine position then the appellant was negligent as a matter of law, when there was testimony from three expert witnesses to the contrary?

II. Did the trial court err in instructing the jury that it could award damages for conscious pain and suffering from the time of decedent's respiratory arrest until his death 12 days later when all evidence showed that the decedent was unconscious throughout that period?

## I.

At the trial, appellees called Barnett A. Greene, M.D., of New York City, who qualified as an expert in anesthesiology. Based on his examination of the hospital records, Dr. Greene testified that the decedent was in general good health prior to the operation and gave his conclusions as to the chronology of events following the tonsillectomy. He stated that when the patient was placed in the care of the recovery room nurse he was in an unconscious state with his head elevated and with no endotracheal tube or artificial airway in place. He testified that this treatment involved three major deviations from what he perceived to be the prevailing standard of post-operative care in Baltimore City or a similar community

and that these deviations were the cause of the decedent's death. They were: (1) as the patient was unconscious, he should not have been extubated in the operating room; *i.e.,* the endotracheal tube then in place should have been permitted to remain; (2) the decedent should not have been placed in a supine position but should have been placed on his side for the reason that while in a supine position the decedent's body fluids were permitted to enter the trachea and these fluids would have been discharged from the mouth if he had been placed on his side; and (3) the anesthesiologist, appellant, should have remained with the unconscious, extubated patient until such time as he had regained a sufficient degree of responsiveness to "respond to [his] own name with a purposeful response," and she should not have left the patient to the care of the recovery room nurses until such time. The appellant, in her own testimony, admitted that the post-operative patient is primarily the responsibility of the anesthesiologist.

Appellant's expert witnesses sharply disagreed with Dr. Greene's exposition of the prevailing standard of post-operative anesthesiological care required by an adult tonsillectomy patient. They also differed with his conclusion from the hospital records that the decedent was unconscious at the time he left the operating room.

Dr. Alim testified in her own behalf that after the operation was completed the patient was semi-conscious and the endotracheal tube was, therefore, no longer necessary. Sheppard Kaplow, M.D., a qualified expert in anesthesiology, concluded from the hospital records that the patient was semi-conscious at the time of extubation and that the accepted standards of anesthesiological practice, under these circumstances, permitted extubation in the operating room, the positioning of the patient on his back and, once vital signs were taken, the entrusting of the patient to the recovery room personnel.

Under cross-examination, the appellant was asked, "If . . . when the patient was brought in the recovery room, he was unconscious and . . . [was] left on his back, would that not

constitute a breach of accepted anesthesia post-surgical care?" She responded in the negative.

Dr. Kaplow, under cross-examination, was asked whether he "would permit an adult tonsil patient in an unconscious state to be left on his back, either elevated or not elevated, without an endotracheal tube in place . . . .?" He answered in the affirmative. In re-direct examination, Dr. Kaplow testified as follows:

"Q. Doctor, so it is clear, Mr. Ellin, I believe, asked you if, in your opinion, it is a deviation from accepted standards to leave an unconscious patient supine in the recovery room with a nurse. What was your answer? A. I said it was not a deviation from the custom of practice.

"Q. Why? Why do you leave an unconscious patient in the recovery room with the nurse, even an unconscious patient? A. Because the nurses, depending on the other complicating factors that the patient may have — unconsciousness itself is not an indication that you have to stay with the patient until the patient is conscious. These nurses who are there are trained, particularly if the patient has a normal airway, without an oral tracheal tube, as referred to here, or a pharyngeal tube, but is breathing without any artificial means, it is within the limits of the nurse's competence, a nurse accepted and trained to work in the recovery room, to watch that patient's airway. For a number of reasons, this patient may not need or cannot tolerate any artificial airway. If the patient is having problems with a normal airway, then an anesthesiologist might decide to stay until the patient can demonstrate further competence, further ability of the patient to maintain his own airway. But this again is a question of judgment, a question of level of consciousness."

Appellant also presented as an expert witness, Louis Fritz,

M.D., Chief of Anesthesiology at Maryland General Hospital, who on cross-examination stated:

"Q. Right. Now, if he were unconscious, Doctor, the position of choice, in view of the fact that there was no longer a tube in his airway to keep it open, would have been the semi-prone position, on his side, somewhat as shown to this jury a dozen times throughout this trial? Let me show it to you, so you know what I am talking about. A. I'm familiar with the position that you are indicating, if that is what you are talking about.

"Q. There is a drawing here of a model on her side, with her head down and a diagram showing the flow of any secretions out of the mouth and onto the table. A. I am familiar with the position that you are indicating.

"Q. You certainly agree that that is a more desirable position with an unconscious patient, is it? A. I do not agree.

"Q. You do not agree with that? A. Right."

This, then, was the state of the testimony when all of the witnesses had been heard and the trial judge was ready to instruct the jury. In the course of those instructions, the court advised the jury as follows:

*"Now then, I instruct you, as a matter of law, that if you find that Dr. Alim left the patient in the recovery room while the patient was unconscious and without an artificial airway and in a supine position, when the patient was unable to respond to his name with purposeful response, then that would constitute negligence and her departure from the recovery room would be premature and your verdict should be in favor of the Plaintiffs against the Defendant Alim. On the other hand, if the evidence does not establish these facts but, rather, that that patient was semi-conscious, was able to respond to verbal commands, was breathing spontaneously, and*

that then it would be proper to place the patient in a supine position or, at least, it would not be improper, it would not be a deviation from the standards of care and one would not need an artificial airway and, hence, the leaving of the patient in the recovery room by Dr. Alim under those circumstances would not constitute negligence. Thus any later act of negligence by the personnel in the recovery room, such as elevating the patient's head, of which the Doctor was not aware, would not constitute negligence in and of itself by the Doctor. I would instruct you in this connection that there is no evidence in this case that Dr. Alim ordered the patient's head to be elevated.

"I want to go back to one other context. The Defense's contention is that, even if the patient was unconscious in the recovery room, that, under the circumstances I have just mentioned, Dr. Alim had a right to leave the recovery room and her departure was not, under those circumstances, premature." (Emphasis supplied).

Appellant urges that the appellees' allegations of negligence rest entirely upon the testimony of Dr. Greene. As we have previously noted, Dr. Greene contended that appellant's treatment of the decedent represented three major departures from the accepted standards of care to which we have previously alluded. In reaching his conclusion, Dr. Greene accepted the nurse's notation on the recovery room chart that the patient was unconscious and rejected the notation on the chart by Dr. Alim that the patient was semi-conscious.

Appellant's defense was based on a two-pronged attack on Dr. Greene's testimony. First, she contended that Dr. Greene's opinion was factually inaccurate because Dr. Greene relied solely upon the nurse's notes which indicated that the patient was unconscious when he was removed to the recovery room. Appellant urges that two of her witnesses, Dr. Stitchel and Dr. Saraceno, testified that they observed the

patient at the critical time and that he was then semi-conscious. Appellant contends correctly that this raised a factual question to be determined by the jury. We note that the judge's instruction on this issue did leave to the jury the factual determination as to the decedent's state of consciousness at the time of his removal to the recovery room. The trial court stated as a matter of law the consequences which would flow from the jury's determination on this issue. Since this factual dispute was left to the jury for decision, we find no error in the instruction in this regard.

Appellant had a second prong to her defense which she renews in this appeal. She pointed out that even assuming, *arguendo,* that Dr. Greene's factual conclusions were correct; *i.e.,* that the decedent was unconscious at the crucial time, there was testimony from her witnesses to the effect that the treatment given did not amount to a departure from accepted anesthesiological standards. This testimony raised an issue of fact which was required to be submitted to the jury for its determination. Appellant urges that the portion of the instruction given by the trial judge, previously emphasized by us in this opinion, was, in view of the contradictory state of the evidence at the conclusion of the case, erroneous and prejudicial. That instruction completely ignored the testimony of the appellant's experts as to the accepted medical and anesthesiological standards applicable to an unconscious post-operative patient. Appellant's counsel objected to the instruction as given, but the trial judge refused to modify or correct the instruction. In a different context, after other objections to the trial court's instruction, the court did give the following additional instruction:

> "Finally, members of the jury, I had defined standard of care to you and thought I had also said this, but if I didn't, I want to instruct you that the standard of care is that degree of care and skill exercised by reasonably competent practitioners in the class of this practitioner, an anesthesiologist, in this community or in a similar community with respect to these affairs.

"Finally, if the jury will remember, I tried to equally give the contentions of both sides. That doesn't mean I am favoring the Plaintiffs or the Defendants. I am simply saying that they have contended various things, each side.

"Now, with respect to the Defendant, I said that the defense's position was that certain things were right. Out of an abundance of caution, I tell you that the Defendants not only contend that these matters were right, but that they were in conformance with the standard of care; that it was not a breach or deviation of any standard of care."

It is hardly a novel principle of law that in the light of contradictory evidence on an issue, the evidence must be submitted to the jury for its determination. *Philadelphia, Wilmington & Baltimore R. Co. v. Fronk,* 67 Md. 339 (1887). It is the office of the judge to instruct the jury on points of law and that of the jury to decide matters of fact. As Judge Lowe, of this Court, pointed out in *Glasgow v. Hall,* 24 Md. App. 525, 532, 332 A. 2d 722 (1975), citing to *Rex v. Poole,* Cas. temp. Hardw. 28, a case predating the founding of our Republic:

". . . it is of the greatest consequence to the law and to the subject that these powers of the judge and jury be kept distinct, that the judge determine the law, the jury the fact; and that if ever they come to be confounded, it would prove the confusion and destruction of the law."

*Accord, Metropolitan Ry. Co. v. Jackson,* Law Rep., 3 Appeal Cases 197.

The trial judge's instruction to the jury that if it found certain facts which he enumerated to exist it must, as a matter of law, find the appellant guilty of negligence and must find in favor of the appellees, was a patently erroneous instruction in view of the testimony of appellant's experts that even if the enumerated facts were found to exist no deviation from the accepted medical and anesthesiological

standards had occurred. The contradictory testimony of the appellant's and appellees' experts raised an issue of fact which was required to be determined by the jury and not as a matter of law by the judge.

Appellees urgently call to our attention the several pronouncements of the Court of Appeals in which the rule has been stated:

> "The instructions of the trial court to the jury must be read as a whole and it is not permissible to take isolated portions which may contain inartistic methods of expression, when the charge, considered as a whole, fairly presents the case to the jury on issues presented by the evidence in the case."

*Clayborne v. Mueller,* 266 Md. 30, 40-41, 291 A. 2d 443 (1972); *Jones v. Federal Paper Bd. Co.,* 252 Md. 475, 484, 250 A. 2d 653 (1968). *See: West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A. 2d 17 (1953).

In *Marlow v. Cerino,* 19 Md. App. 619, 633, 313 A. 2d 505 (1974), this Court had before it a medical malpractice case in which we rejected a plaintiff's attack on the trial court's instructions. Quoting from *Beckner v. Chalkley,* 19 Md. App. 239, 248, 310 A. 2d 569 (1973), we stated:

> " 'The Court of Appeals and this Court have consistently held that if jury instructions, when read as a whole, clearly set forth the applicable law, there is no reversible error. *Nizer v. Phelps* [252 Md. 185, 249 A. 2d 112 (1969)]; *Alston v. Forsythe,* 226 Md. 121, 172 A. 2d 474 (1961); *Lemons v. Chicken Processors,* 223 Md. 362, 164 A. 2d 703 (1960); *Kable v. State,* 17 Md. App. 16, 299 A. 2d 493 (1973); *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171 (1970). One of the reasons for such a rule is that sometimes a trial court will err in some of the legal propositions announced to the jury, but the errors are harmless. "Wrong directions which do not put the traveler out of his way, furnish no reason for repeating the journey." *Cherry v. Davis,* 59 Ga. 454, 465 (1877).' "

We have no quarrel with these statements as abstract principles of law. Our problem is that when we apply these principles to the trial judge's instructions in this case, we are forced to conclude that he committed reversible error. Appellees conceded in argument before us that standing alone the instruction given which required a finding of negligence by Dr. Alim "as a matter of law," assuming certain facts, was erroneous. They contend that the other instructions given by the judge and the final instruction given cured the error. We do not agree. If anything, we find that the additional instructions exacerbated the confusion. Once the trial judge instructed the jury that if they found certain facts to be true, then they must find as a matter of law for the plaintiff, it was no remedy to tell the jury that the *defense contended* that under those same facts the care was appropriate. That language can hardly be characterized as submitting the question to the jury for its determination.

We assume that the jury, having been made aware of the respective rights and duties of the judge and the jury in determining matters of law and of fact, would have followed the instructions of the trial judge. As was stated by the Supreme Court in *Delli Paoli v. United States,* 352 U. S. 232, 242, 77 S. Ct. 294, L.Ed.2d 278 (1957):

> "It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice."

According to the specific language in the trial court's instructions, the jury was *required as a matter of law* to

return a verdict for the plaintiffs if they found the facts enumerated by the judge to exist. Neither the prior general instruction that the jury was to determine the appropriate standard of medical and anesthesiological care, nor the subsequent instruction that the appellant *contended* that the care given the patient was within appropriate standards could cure the obvious error of the trial court's instruction in light of the conflicting testimony. Under the circumstances, we must reverse and grant a new trial.

In view of this conclusion it is not necessary that we consider the second issue raised by this appeal since that issue is an integral part of the controversy and will certainly be one of the issues to be determined in the new trial.

*Judgments reversed; case remanded*
*for new trial.*
*Costs to be paid by appellees.*