## LEON R. LEVITSKY v. PRINCE GEORGE'S COUNTY, MARYLAND

[No. 459, September Term, 1981.]

*Decided January 8, 1982.*

The cause was argued before THOMPSON, LOWE and MASON, JJ.

*Stephen A. Friedman,* with whom were *Shelly E. Mintz* and *Baskin & Sears* on the brief, for appellant.

*Steven G. Chappelle, Associate County Attorney for Prince George's County,* with whom were *Robert B. Ostrom, County Attorney for Prince George's County,* and *Michael O. Connaughton, Deputy County Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Dr. Leon Levitsky, appellant, appeals from an adverse judgment following a bifurcated trial in the Circuit Court for Prince George's County with respect to the condemnation of 6,380 square feet of property. A hearing was initially held before Judge James M. Rea regarding the necessity of the taking. Judge Rea concluded that the taking was neither arbitrary, oppressive, nor so unreasonable as to suggest bad faith. A jury subsequently awarded appellant $5,300 in damages. The appellant raises four issues on appeal:

1. "Did the trial court err in finding that the decision of the condemnor was not so oppressive, arbitrary or unreasonable as to suggest bad faith and that there existed a necessity to justify taking the slope easement?

2. Did the trial court err in permitting the County to call the appellant's appraiser, Paul J. Gilroy, as witness during their case in chief and in disclosing the fact that he was retained by appellant?

3. Did the trial court err in refusing to instruct the jury in accordance with appellant's prayers regarding valuation of proximity damages?

4. Did the trial court err in not granting a directed verdict at the close of the appellee's case in

chief or in the alternative, by not granting the appellant's Motion for Judgment N.O.V. or in the alternative new trial?"

## FACTS

As a part of a project to widen a two-lane highway and to construct a sidewalk and gutter, Prince George's County, appellee, condemned 6,380 square feet of land belonging to Dr. Leon Levitsky, appellant. The County's proposal included the resloping of appellant's property to a 2:1 slope easement. The appellant, in an effort to retain his land in its natural state, protested the proposed 2:1 slope easement and sought to have the County construct a retaining wall in its stead.

At trial, the County presented the testimony of Robert C. Kelley, Chief of the Design Division of the Department of Public Works. He testified that the determination as to the mode of construction was based on "value engineering," i.e., the most economical means available. While admitting that an independent cost analysis was not conducted with respect to the construction on the appellant's land, he asserted that the retaining walls were more costly "nine out of ten times." He further testified that the County makes use of a retaining wall in only one of two situations: first, where there is a structure existing on the land which would be adversely affected by the implementation of a 2:1 slope, or second, where the land itself evidences some "special" problem or instability and thus would not adhere to the slope. Mr. Kelley averred that he could not recall an occasion where the County had used a retaining wall merely to avoid having to slope the property. Finally, he testified that had a retaining wall been necessitated with respect to appellant's property, it would have been implemented.

Mr. Leroy Fey, a Right-Of-Way engineer for the County, additionally testified that the decision as to the manner in which to "take" property was an economic determination. He stated that the engineers' expertise in the area of con-

struction costs, enabled them to render "instant decisions" as to the most economical means of accomplishing their task. Mr. Fey further testified as to his belief that the County acted in good faith and in a reasonable manner in its determinations with respect to appellant's property.

The appellant's witness, Bernard J. Bovelsky, an engineer, was questioned on cross-examination with respect to a statement rendered at a pre-trial deposition whereupon he testified as to the soundness of the County's plan, stating, "I see nothing engineeringly wrong with it. It was designed properly." When asked at trial whether such statements continued to be true, he responded that while he may have investigated the possibility of alternative modes of construction, he would have done "exactly what the County did."

Finally, Mr. Kenneth Adelberg, a consulting engineer, testified on behalf of the appellant. He opined that the County's plans to reslope the appellant's property were unnecessary. He stated that as an alternative the County could construct a retaining wall which would eliminate the need for a slope easement or they could straighten the road, thereby eliminating the need to affect appellant's property entirely. He further stated that the County's plans as they exist on the construction drawings indicate a steeper slope than the asserted 2:1 and would in certain areas result in a slope closer to a 1:1. Mr. Adelberg admitted that aside from the possible difficulties stemming from the slope drawings, he could not say the basic engineering practices were wrong.

At the conclusion of all the evidence, the trial court ruled in favor of the appellee holding that the projected plans were neither arbitrary nor unreasonable. The following week additional evidence was adduced before a jury for determination of the amount to be due as damages.

The jury traveled to the appellant's property and viewed the subject area as well as adjacent property. Upon returning to the courtroom, the jury heard the testimony of Mr. Fey regarding the purpose of the entire project and the

manner in which the County intends to stabilize the 2:1 slope.

The County thereafter called two appraisers, Richard Pierce, who valued damages at $800, and Paul Gilroy, who valued the damages at $5,185. Mr. Gilroy had originally been retained by the appellant to appraise the subject property. Appellant chose not to call Mr. Gilroy as a witness but in accord with Md. Rule U12 subsection b (1) furnished the County with a copy of his appraisal. Over objection by appellant and Mr. Gilroy, his testimony was permitted. Additionally, over objection, the County was allowed to question Gilroy as to his earlier involvement with the appellant.

The appellant proceeded with the testimony of Dr. Levitsky who testified as to his plans for the property. He estimated the value of the property as between $50,000 and $60,000 and estimated the damage percentage at 100%. This testimony was followed by that of architect William Trujillo, who further testified as to the proposed plans of Dr. Levitsky. Kenneth Adelberg was called as a witness to discuss the mode of engineering proposed by the County and the effect of such methods on proximity damages. Appellant's last witness was appraiser, Michael Hagen, who, using a market value approach, arrived at an estimated value of $27,043 in damages.

The jury thereupon retired and returned with an inquisition in the amount of $5,300.

## I Necessity for the Taking

Where a municipal corporation exercises its power to take property courts generally will not interfere unless: (1) there is no necessity for the taking, and (2) the decision of the condemnor is so oppressive, arbitrary or unreasonable as to suggest bad faith. *Washington Suburban Sanitary Commission v. Santorios,* 234 Md. 342, 199 A.2d 206 (1964). The necessity for the taking need not be absolute as long as it can be shown to be reasonable under the circumstances. *Id.* at

346; *Johnson v. Consolidated Gas, Electric Light and Power Co.,* 187 Md. 454, 50 A.2d 918 (1947). It is uncontroverted that a necessity exists for the County to widen the road adjoining appellant's property and to construct a sidewalk and gutter. Thus, the aspect of necessity focused upon at the trial level was the decision of the County to proceed by method of slope easement rather than building a retaining wall as requested by appellant. Appellant urges that the County's resloping of his property will have the proximate effect of rendering the land unfit for a planned residence, pool and tennis court, while the implementation of a retaining wall would allow him to proceed as intended. In response to similar protestations, the Court of Appeals observed in *Boswell v. Prince George's County,* 273 Md. 522, 523-24, 330 A.2d 663 (1975):

> "Landowners when faced with a proposed acqui-
> sition of their land for public improvements,
> whether by way of easement or in fee simple, have
> often suggested to the courts that they saw a better
> way to do the improvement than that proposed by
> the condemning authority. *See, e.g., Director v.
> Oliver Beach Imp. Ass'n.,* 259 Md. 183, 269 A.2d
> 615 (1970); *State Roads Comm. v. Franklin,* 201
> Md. 549, 95 A.2d 99 (1953); *Johnson v. Gas & Elec-
> tric Co.,* 187 Md. 454, 50 A.2d 918 (1947); and
> *Murphy v. State Roads Comm'n.,* 159 Md. 7, 149 A.
> 566 (1930). They have been uniformly unsuccessful
> in this Court."

In the present case the appellant's assertion of bad faith on the part of the County will be equally unsuccessful.

The appellant urges that bad faith is evidenced by the failure of the County to perform cost estimates of the various procedures prior to its decision to implement a particular mode of construction. The absence of such computation was logically explained by Mr. Fey, a Right-of-Way engineer for the County who stated:

> "Our design engineers know what basic con-
> struction costs are, such as walls. They know

> basically what construction costs are such as slopes, and in the orderly process of designing a roadway, they can virtually tell like you quoting from some case history out of your head, that the costs of a wall far exceeds the cost of grading. And as a result, they don't sit down and say, well this square foot of land on Dr. Levitsky versus this square foot of wall on Dr. Levitsky is thus and so. They do not do that. They know they, because they are experts, they are designers, roughly, what the costs are going and, and as a result they make instant decisions on the drafting board."

It is not unreasonable for the County to rely on decisions rendered by their engineers without computing a separate cost analysis for every project contemplated. These decisions are not the result of instinct, as alleged by appellant, but rather expertise acquired through years of engaging in similar projects.

Further evidence as to the reasonableness of the actions by the County is found in the testimony of appellant's own expert, Mr. Bernard Bovelsky, a civil engineer. Mr. Bovelsky averred at his deposition: "I see nothing engineeringly wrong with it [the County's plan]. It was designed properly." When later questioned at trial as to whether he agreed with this previous statement he responded that while he personally would have investigated other alternatives he would have done "exactly what the County did."

It is clear that the construction of the retaining wall may have been more conducive to the plans of the appellant, however, individual preference or convenience is not sufficient to overturn the decision of the County. We find no evidence indicating that the County acted arbitrarily or unreasonably in its decision making processes. Without such showing the judiciary is without liberty to substitute its judgment for that of the County. We see no error in the trial judge's ruling with respect to reasonableness and necessity of the taking.[1]

---

1. Appellant additionally asserts that the County has attempted to shift the costs of installing the road by forcing him to stabilize and maintain what

## II Expert Witness's Testimony

The appellant contends that the trial judge erred in first, permitting the County to call the appellant's appraiser, Paul Gilroy, as a witness in violation of the attorney-client privilege and second, in permitting the County to elicit from Gilroy the fact that he had originally been employed by the appellant. Appellant asserts that the disclosure of the latter prejudiced the jury into giving undue weight to Gilroy's opinion as evidenced by their award of damages within $200 of his appraisal.

The attorney-client privilege is the oldest of the privileges for confidential communications. 8 Wigmore, *Evidence* § 2290 at 542 (McNaughton rev. 1961). In the State of Maryland, the privilege is one of statute, found in Md. Cts. & Jud. Proc. Code Ann. § 9-108 (1980).[2] It is a rule of evidence which prohibits the disclosure of the substance of a communication made in confidence by a client to his attorney for the purpose of obtaining legal advice. *See, State v. Pratt,* 284 Md. 516, 398 A.2d 421 (1979); *Harrison v. State,* 276 Md. 122, 345 A.2d 830 (1975); 8 Wigmore, *supra,* § 2292 at 554. The privilege is grounded on the policy of encouraging individuals needing legal advice to disclose information freely to their attorney without fear that such facts will be made public. *See, State v. Pratt, supra,* 284 Md. at 520; *Harrison v. State, supra* 276 Md. at 135; *People ex rel. Department of Public Works v. Donovan,* 57 Cal.2d 346, 19 Cal. Rptr. 473, 369 P.2d 1 (1962); *People v. Edney,* 385 N.Y.S.2d 23, 26, 39 N.Y.2d 620, 350 N.E.2d 400 (1976).

The complexities inherent in modern litigation have rendered it difficult, if not impossible, for attorneys to represent the interests of their clients without the assistance of

---

he characterizes as a "vertical cliff." In that the County has steadfastly maintained its intent to stabilize the slope with sod, we find no merit in the assertion.

**2.** Section 9-108 of the Courts Article provides:

"A person may not be compelled to testify in violation of the attorney-client privilege."

a variety of trained, non-legal individuals, i.e., law clerks, typists, messengers, etc. *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038 (E.D. N.Y. 1976), *aff'd. mem.,* 556 F.2d 556 (1977); *State v. Pratt, supra,* 284 Md. at 520. In recent years various jurisdictions have been expanding this group of privileged agents to include those specialists necessary for the attorney to effectively represent his client. This expansion seeped into Maryland law in *State v. Pratt, supra; see,* Note, 9 U.Balt. L.Rev. 99 (1979). In *Pratt,* the defendant, charged with the murder of her husband, was evaluated by a psychiatrist at the request of her attorney. At trial, the psychiatrist was called, over objection by the accused, to testify as to his opinion of appellant's sanity. The Court held that the communications made by the defendant to the medical expert fell within the scope of the attorney-client privilege. The Court theorized that inasmuch as the expert functioned as an agent of the attorney, any disclosures from the client to the expert were privileged when such information was used to enable the attorney to adequately represent his client. *Id.* at 520. The Court confined its holding to criminal causes, thereby leaving open the scope of the privilege with respect to employment of an expert in a civil matter. *Id.* at 523, n.5.

In jurisdictions other than Maryland, various theories have been offered in justification of the expansion of the privilege. One line of cases has likened the physician to an interpreter, without whom neither the attorney nor the client could fully understand the significance of the client's information. *United States ex rel. Edney v. Smith, supra,* 425 F.Supp. at 1047; *see also, City and County of San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951); *Lindsay v. Lipson,* 367 Mich. 1, 116 N.W.2d 60 (1962); *State v. Kociolek,* 23 N.J. 400, 129 A.2d 417 (1957). In *City and County of San Francisco, supra,* a personal injury suit, the Supreme Court of California observed:

"Had Hession himself described his condition to his attorneys there could be no doubt that the communication would be privileged and that neither

the attorney nor Hession could be compelled to reveal it. . . . It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both." 231 P.2d at 31.

The conceptional premise for this extension of privilege has not gone without criticism. As Professor Friedenthal has noted:

"The court failed to discuss the fact that the doctor's observations and conclusions, apart from the client's communications to him, constituted knowledge on the part of the doctor which would be highly material to the case. Thus, in transmitting the 'client's communication' the doctor became far more than a mere interpreter, for he added an important increment of knowledge of his own. It seems that this knowledge should be treated just like the knowledge of any other witness and should be discoverable from the doctor himself." Freidenthal, *Discovery and Use of an Adverse Party's Expert Information,* 14 Stan. L.Rev. 455, 463-64 (1962).

Logic might seem to dictate that the holding of *Pratt* be equally applicable to its civil counterpart. In both *Pratt* and *City and County of San Francisco,* the individuals were required to submit to medical evaluations at the behest of their attorneys. These evaluations necessitated the revelation of personal facts which normally would be concealed.[3] Thus, the determinative element establishing the cloak of privilege is the presence of a confidential communication emanating from the client. There is an obvious distinction between the opinion of an appraiser who places a monetary value on land which is open and visible to all,

---

3. Although the communication between a physician and a client may not be entirely of a verbal nature, i.e., facts adduced from examination and symptomatology, it is clear that the privilege embraces not only oral or written statements but actions, signs, or other means of communicating information by a client to his attorney. People v. Glen Arms Estate, 230 Cal. App. 2d 841, 41 Cal. Rptr. 303 (1965).

and that of a physician who conducts an evaluation of an individual. As commented by the Supreme Court of South Dakota in *State Highway Commission v. Earl,* 82 S.D. 139, 143 N.W.2d 88 (1966):

> "The purpose behind our attorney-client privilege is to encourage a client to freely communicate with his attorney without fear of disclosure. Obviously its protective mantle does not extend to an appraiser of real property. He is not an attorney and the appraisal process of inspecting property, examining public records, comparing sales, and applying knowledge, training and experience in forming an opinion of value does not involve a confidential 'communication made by the client.' The mere fact the expert may have communicated his opinion of value to either the attorney or client does not make it a privileged communication." 143 N.W.2d at 92.

It appears that the distinction should be predicated on the source of the expert's information, rather than civil versus criminal. The real estate appraiser at issue who obtained his opinion by viewing property and applying his expertise was not transmitting appellant's "confidence." His communication, therefore, cannot be protected by the attorney-client privilege, the sole purpose of which is to encourage full disclosure by the client to the attorney. *See, Oceanside Union School District v. Superior Court,* 58 Cal.2d 180, 23 Cal.Rptr. 375, 373 P.2d 439 (1962). Such expansion of the domain of protective material would be directly contrary to the well-established policy in favor of strict construction of the privilege and interest of bringing to light relevant facts. *People ex rel. Department of Public Works v. Donovan, supra* 369 P.2d at 6-7.[4]

---

4. The appellant additionally asserts that the privilege attaching to the work product of an attorney operates to bar the County from calling his appraiser as a witness. This contention has been uniformly rejected. *See,* Thomaston v. Ives, 156 Conn. 166, 239 A.2d 515 (1968); State ex rel. State Highway Comm. v. Steinkraus, 76 N.M. 617, 417 P.2d 431 (1966); Annot., 71 A.L.R.3d 1119 (1976).

This brings us to the second prong of the appellant's attack on the testimony of Paul Gilroy. He asserts that even if Gilroy's testimony is not privileged, the County should not have been permitted to elicit the fact of his original employment by appellant. This issue is one which has been the subject of much litigation throughout the country. *See,* Annot., 71 A.L.R.3d 1119 (1976). Many courts have held that a party to an eminent domain proceeding may, either as an absolute right or as a matter resting within the sound discretion of the court elicit from the witness the fact that he was originally employed by the other party. *See,* e.g., *Arkansas State Highway Comm. v. Phillips,* 252 Ark. 206, 478 S.W.2d 27 (1972); *Urban Renewal and Community Development Agency of Louisville v. Fledderman,* Ky, 419 S.W.2d 741 (1967); *Logan v. Chatham County,* 113 Ga. App. 491, 148 S.E.2d 471 (1966). Other courts have held such evidence to be inadmissible. *See,* e.g., *State ex rel. Smith v. Wilkinson-Snowden, McGehee, Inc.,* Tenn. App., 571 S.W.2d 842 (1978).

The Court of Appeals expressed its preference for the former view in *City of Baltimore v. Zell,* 279 Md. 23, 367 A.2d 14 (1977). The Court held that the trial judge did not err in permitting the land owners to disclose to the jury that such witness had initially been employed by the condemnor.[5] In its opinion the Court determined that:

> "The extent to which such questions are permitted must, in our view, remain in the sound discretion of the trial judge. In the absence of a clear abuse of discretion in a particular case, the action of the trial judge in permitting or not permitting them will be upheld. In the case before us, there was no abuse of discretion in allowing the defendants to bring out the fact that the witness whom they called had initially been employed in the matter by the other side." *Id.* at 28.

In the present case we find no abuse of discretion by the trial judge.

---

5. The propriety of calling the witness was not raised in that case.

### III Jury Instructions

The appellant next contends that the trial court erred in its refusal to instruct the jury in accordance with the appellant's prayers regarding valuation of proximity damages. Following the judge's instructions to the jury, appellant objected to various instructions stating:

> "As far as our exceptions, we have been over these in chambers. But for the record, I would except to not giving the last sentence in 4; not giving number 7, 8, 9, 10, 11, 13, 15, the last paragraph of 18. That's it.
>
> The Court: The Court recognizes the exceptions."

The requirements of Md. Rule 554 d are not met where a party merely makes reference to the instruction number without further expounding upon the actual ground of the objection.[6] *Jones v. Federal Paper Bd. Co.,* 252 Md. 475, 250 A.2d 653 (1969); *Bauman v. Woodfield,* 244 Md. 207, 223 A.2d 364 (1966); *Belt's Wharf v. Internat. Corp.,* 213 Md. 585, 132 A.2d 588 (1957); *cf., Sergeant Co. v. Pickett,* 283 Md. 284, 388 A.2d 543 (1978) (The court found a substantial compliance with Md. Rule 544). The appellant failed to state the basis of his objection to the jury instructions so the issue is not preserved for review. If the question were before us we would rule that the instructions given adequately covered the instructions requested.

### IV Appellant's Motion for Directed Verdict, Judgment N.O.V. and New Trial

The appellant asserts that the trial judge erred in his refusal to grant a directed verdict, a judgment n.o.v., or a

---

6. Md. Rule 554 d reads as follows:

"If a party has an objection to any portion of any instruction given, or to any omission therefrom, or the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge."

new trial. The assertion was predicated on the belief that the damages suffered were far in excess of those awarded by the jury.

In considering a motion for a directed verdict, the Court must assume the truth of all credible evidence on the issue and all the inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made. *Impala Platinum v. Impala Sales,* 283 Md. 296, 389 A.2d 887 (1978). If a non-moving party offers "any evidence competent, pertinent and coming from the legal source, legally sufficient to prove plaintiff's case, the motion for directed verdict should not be granted." *Lenehan v. Nicholson,* 214 Md. 414, 135 A.2d 447 (1957). The same rule has been held applicable to a motion for a judgment n.o.v. *James Gibbons Co. v. Hess,* 44 Md. App. 216, 407 A.2d 782 (1979). In the instant case the experts' testimony provided a workable range of damages as well as alternate formulas from which to evaluate their award. The trial judge did not abuse his discretion in denying the appellant's motions for a directed verdict or a judgment n.o.v. Neither do we see any abuse of discretion in his denial of a motion for a new trial.

*Judgment affirmed.*
*Appellant to pay the costs.*