477 A.2d 1206

**Wayne Phillip MORRIS**

v.

**STATE of Maryland.**

**No. 1532, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 16, 1984.

660

Patrick D. Hanley, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., and John L. Scarborough, State's Atty., Cecil County, on the brief, for appellee.

Argued before MOYLAN and LISS, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

LISS, Judge.

Appellant, Wayne Phillip Morris, was charged by indictment in the Circuit Court for Cecil County with murder, arson and related charges.

At a pretrial hearing the presiding judge declined to quash a summons issued by the State for an expert witness previously consulted by the defense. At the trial, before a jury, the expert was permitted to testify as a State's witness and was also permitted to conduct an in-court demonstration before the jury.

During the trial, a tape recorded statement made by the appellant was played to the jury and a transcript of the statement was given to each juror. Appellant's motions for judgment of acquittal were denied, but several related counts were dropped by the State. Upon retiring to deliberate, the jury requested the actual tape of appellant's statement. The trial court denied the request. Later, the jury returned verdicts of guilty of first degree murder and arson.

Subsequently, appellant filed a motion for a new trial, and issued summonses for several of the jurors who sat in the case. Appellant proffered to the court that several members of the jury panel had been guilty of misconduct outside the jury room involving the use of the transcripts of the statements. The court refused to hold an evidentiary hearing and granted the State's motion to quash the summonses for the jury members. Sentences were thereupon imposed and it is from these judgments that this appeal has been filed.

Appellant raises the six following issues to be addressed by this appeal:

1. Did the trial court commit error in allowing the State to call as its witness an expert initially consulted by the defense, but whom the defense did not intend to call to testify at trial?

2. Did the trial court commit error in allowing the State to offer evidence that appellant had invoked his

right to remain silent sometime after *Miranda* warnings had been administered to him?

3. Did the trial court commit error in allowing the State to conduct an in-court demonstration?

4. Did the trial court commit error during deliberations in refusing to comply with the jury's request for the actual tape of appellant's statement?

5. Did the trial court commit error when it refused to conduct an evidentiary hearing concerning juror misconduct?

6. Was the evidence legally sufficient to sustain the verdicts?

## —THE FACTS—

At 2:43 A.M. on August 6, 1982, a male caller told a dispatcher for the Elkton Police Department that there was a dead girl at a local motel, and that her room was on fire. The caller refused to give his name or location to the dispatcher, because he stated that it would incriminate him.

Police went to the motel. Within minutes of their arrival, they noticed that there was a fire in one of the rooms. They extinguished the fire, which had burned through the carpeting and into the floor, charring a ¼ inch area. Inside the room they found the partially clad body of the victim, Shirley Thompson.

Thompson had been strangled. A black cord, torn from a bedside clock-radio, had been wrapped around her neck. The clock read 1:39.

On Thompson's exposed back, the words "Die now" had been written with a reddish and black substance. A red nail polish cap and black mascara brush were found entangled in her hair. Their capless bottles were found nearby, and chemical analysis revealed that the substance on her back had similar characteristics to the substance in the bottles.

At approximately 3:00 A.M., the same male made another call to the Elkton police. This time he said that the girl's

name was "Shirley Thomas"; that she was from Dover; that he had left George's Bar with her; and that her boyfriend had murdered her.

Around 3:30 A.M., the appellant telephoned the State Police. He was very emotional. He told the desk sergeant that he already had spoken to the Elkton police. He gave his location, and eventually was brought to the barracks.

Appellant agreed to give a taped statement. He said that he had gone to George's Bar at 9:00–9:30 the previous evening. He saw "Shirley Thomas" with some other guy. Eventually, appellant and the victim went to her motel room. Forty-five minutes later, there was a knock on the door. Shirley got out of bed and cracked the door. Two men—one of whom had been with her earlier—forced their way into the room. While one of the men held the appellant, the other assaulted Thompson and accused her of infidelity. Eventually, he strangled her with the cord from the clock-radio. Her assailant also stuck a jewelry pin into her chest and began dumping things into a drawer, which he said were going to burn. The other man took appellant outside. Appellant stated that he was then able to escape, and eventually called the Elkton police.

Several hours after giving the statement, appellant was arrested and charged with the crime.

He was one of three suspects arrested by the Elkton police. The other two were never charged.

One of them was Robert Foster. He was arrested at the scene of the crime within an hour after the police arrived. Foster admitted being intimate with Thompson, and said that she had broken off their relationship several days before the murder. Although denied by him, there was evidence that subsequent to the murder Foster admitted that he was jealous. Glass particles from his shoes had similar properties as glass from a broken vodka bottle found in Thompson's motel room. It was stipulated, however, that a barmaid would have testified that Foster was in

her establishment for "last call" around 1:45 A.M. the morning of the murder.

The Elkton police also had arrested Joseph Bursler shortly after the murder. Bursler was a suspect because they found him passed out in a phone booth; he was a male; and it was known that a male had used a telephone to call the dispatcher. Before his own arrest, appellant had identified Bursler as Thompson's assailant. For his part, Bursler admitted that on the night preceding the murder he had picked up the victim in a bar; had had intercourse with her in her motel room; and had spent much of the next day bar hopping with her. Thompson's blood-alcohol content was .17 at the time of death. However, Bursler claimed that he became "pretty soused" and fell asleep at a table in George's Bar on the evening of the murder. He slept until the bar closed, when he headed to the phone booth.

A barmaid at George's Bar agreed that Bursler had fallen asleep at the table. He was not awakened until 3:00 A.M. the morning of the murder. She also testified that around 11:30 P.M.–12:00 A.M. that evening, she saw appellant and Thompson leave the bar together.

A defense witness stated that he saw Thompson leave the bar with Bursler and another man around 9:30 or 10:00 P.M. the evening of the murder. However, he admitted that he could not remember anything that happened after 10:30 P.M. up until he woke up in his truck on the bar parking lot later the next morning.

At the time of his arrest, the police did not find any unusual marks on appellant. He denied making the phone calls about the fire and the body. Some of his clothing was seized for analysis.

Just above the pocket appellant's shirt had a streak of black substance similar to mascara. An FBI analysis of the substance proved inconclusive. During the trial, after a defense motion to quash the summons had been denied, the State called a defense expert who testified that there was a

similarity between the substance on the shirt and the substance on the mascara brush found in the victim's hair.

Appellant's pants also were seized. A fabric print lifted from the top of the clock-radio by the victim's bed did not match the weave of appellant's pants.

Appellant's shoes were seized as well. A particle of glass recovered from one of them had similar characteristics as the glass from the broken vodka bottle.

Appellant did not testify at trial.

During the trial, the judge overruled a defense objection to an in-court demonstration of the application of fingernail polish and mascara to the back of a State trooper by another police officer.

Also during the trial, evidence was produced by the State that Bursler and Foster had been very cooperative with the police. On the other hand, evidence was offered that appellant had invoked his right to remain silent even though there were a lot of questions the investigator wanted to ask him. Defense counsel's request during the testimony that the court give "some instruction of the jury of no negative connotation from that, of the invoking *Miranda* rights" was denied by the trial judge.

During cross-examination of a State witness, the defense abandoned a line of questioning regarding the taped statement of appellant after the prosecutor promised to introduce it with his next witness. While the prosecutor had the tape played during the testimony of his next witness, only a transcript of the tape—not the tape itself—was marked as an exhibit. When the jury began deliberating, it asked for the actual tape. The court rejected the defense argument that the State had promised to introduce the tape and thereby misled the defense, and refused to allow the jury to have it during deliberations.

The jury returned guilty verdicts to first degree murder and malicious burning, after the court had denied motions for judgment of acquittal.

Subsequently, when the defense issued summonses for several of the jurors in connection with a motion for a new trial, the State moved to quash them. At the hearing on the motion to quash, the defense proffered that four of the jurors had taken transcripts of the statement of appellant home with them during the trial, and that one of them had checked out the times in the statement. At the end of the hearing the court denied the motion to quash, but several days later, reconsidered, and granted it. During a later hearing, the defense proffered that two of the jurors had taken the transcripts of the statement home during the trial; that both made time logs from the statement and other evidence; that one of them was familiar with the distances involved; both of them determined that his time "did not jive," and as a result one of them had made up her mind that he was guilty; and, it was proffered, that they presented their time log and results to their fellow jurors during deliberations.

Judgment was entered on the verdicts and the court below imposed terms of imprisonment of life for the murder with ten years consecutive on the arson charge.

Appellant then noted this appeal.

1.

As a portion of its case-in-chief, the State called as its witness an expert witness who had initially been consulted by the defense. The expert had been consulted to analyze a stain on the shirt worn by the appellant at the time of his arrest. The FBI had examined the shirt but its determination had been inconclusive. Because the defense refused to stipulate to the chain of custody of the shirt, the trial court had issued an order requiring the State to deliver the shirt to the laboratory of the expert for analysis and to be present during the analysis. It was the court's opinion that this was required in order to protect the evidence and to verify the chain of custody of the physical evidence from the police to the expert.

Prior to trial the State issued a summons for the expert originally consulted by the defense. Defense counsel promptly filed a motion to quash the subpoena on the grounds that it did not intend to offer the expert as a witness for the defense at trial, and that to permit the State to call the witness would result in a violation of the attorney-client privilege or in the alternative a violation of the work-product doctrine and the underlying purposes of criminal discovery pursuant to Maryland Rule 741 d 2. In a pretrial hearing, the court rejected the motion to quash. Appellant contends that this amounted to reversible error.

The Court of Appeals had before it in *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979) a somewhat similar case. There the issue was whether communications made by a defendant to a psychiatrist employed by defendant's attorney to aid in an insanity defense to a charge of murder were within the scope of the attorney-client privilege. The Court held that communications made by a defendant in a criminal case to an expert in order to equip that expert with the necessary information to provide the defendant's attorney with the tools to aid him in giving his client proper legal advice are within the scope of the attorney-client privilege.

There is a distinction to be made, however, between the disclosure of confidential communications whether made to an attorney or to an agent consulted by the attorney and information gained by objective scientific analysis conducted by experts, no matter by whom employed.

In *Levitsky v. Prince George's County*, 50 Md.App. 484, 439 A.2d 600 (1980), this Court had before it a case in which the issue was whether the calling of an opponent's appraiser in a condemnation case was a violation of the attorney-client privilege. We held that the determinative factor to establish the cloak of privilege in the case was not whether the case was criminal or civil but rather whether the expert's opinion was based on confidential communications emanating from the client. In *Levitsky v. Prince George's County, supra*, at 494, 439 A.2d 600, we quoted with

approval from *State Highway Commission v. Earl,* 82 S.D. 139, 143 N.W.2d 88 (1966), a South Dakota Supreme Court case, as follows:

> The purpose behind our attorney-client privilege is to encourage a client to freely communicate with his attorney without fear of disclosure. Obviously its protective mantle does not extend to an appraiser of real property. He is not an attorney and the appraisal process of inspecting property, examining public records, comparing sales, and applying knowledge, training and experience in forming an opinion of value does not involve a confidential "communication made by the client." The mere fact the expert may have communicated his opinion of value to either the attorney or client does not make it a privileged communication. 143 N.W.2d at 92.

Similarly, the experiments conducted by the expert with the shirt worn by the defendant and the opinions he reached as a result of these scientific explorations were not predicated upon any information furnished by the defendant to either his attorney or to the expert and were not therefore protected by the attorney-client privilege. *See also United States v. Nobles,* 422 U.S. 225, 233–234, 95 S.Ct. 2160, 2167–2168, 45 L.Ed.2d 141 (1975), where it was held that the compelled production of the report of a defense investigator which did not contain any information conveyed by the defendant did not violate defendant's Fifth Amendment privilege against self-incrimination.

We find no merit in defendant's reliance on the work-product doctrine. That doctrine is intended to protect and to act as a limitation upon pretrial discovery of a lawyer's strategies, legal theories and mental impressions. It was never intended to be an evidentiary privilege. This is evidenced by Maryland Rule 741 d 2, which grants the State pretrial discovery of written reports of defense experts who will be called as witnesses at the trial.

Finally, it is obvious to us that under the special circumstances in this case, the court made no error in denying the

defendant's motion to quash the summons for the expert witness. The State's own expert (the FBI) did not conduct the test conducted by appellant's expert because to do so would have required the destruction of the physical evidence. Once appellant's expert in his testing of the shirt destroyed the evidence it obviously made it impossible for the State to conduct the same test. It seems clear to us that under these circumstances "the interest of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence," *United States v. Nobles, supra*, 422 U.S. at 238, 95 S.Ct. at 2170, would not be served by extending the work-product doctrine to exclude the expert's evidence.

2.

■ Appellant next claims that the State improperly introduced evidence that he invoked his right to remain silent after being given *Miranda* warnings and improperly contrasted this conduct with the willingness of the other two suspects to cooperate with the police. We find no merit in this contention for a number of reasons. Initially, we find that this issue has not been preserved for appellate review. At trial, Officer Perrot, one of the investigating officers, described an interview conducted on the morning after the burning and murder, at which appellant, another officer and an Assistant State's Attorney were present. Appellant was advised that he was being interviewed as a "victim-witness." Perrot testified that at "one point when the Assistant State's Attorney asked the appellant certain questions, Mr. Morris became extremely belligerent and would not say anything else." No objection to this testimony was made by the appellant. The officer was then asked whether this was the first time appellant had been reluctant to talk and the officer replied in the negative. He said that during the morning while the defendant was in the Elkton Police Department he was at first willing to answer specific questions but as time wore on he began giving evasive answers and was extremely uncooperative. Appellant objected at that point but only to request that the witness be more

specific. The court instructed the police officer to be more specific and the witness continued to testify, *without objection,* as to appellant's willingness and unwillingness to answer specific questions. At no point did appellant object to the admissibility of this testimony or move to strike any of the testimony given. Under these circumstances, we conclude that the issue has not been preserved for appellate review. *See Brooks v. State,* 35 Md.App. 461, 371 A.2d 674 (1977).

### 3.

■ As a general rule the trial judge is vested with the discretion to permit or deny in-court demonstrations. *Brooks v. State,* 24 Md.App. 334, 330 A.2d 670 (1975). That discretion includes the right to simulate in the courtroom to the jury or other trier of fact the conditions existing at the time and place of the crime. *Cf. Midgett v. State,* 223 Md. 282, 164 A.2d 526, *cert. denied,* 365 U.S. 853, 81 S.Ct. 819, 5 L.Ed.2d 817 (1960).

■ When the State indicated that it wished to demonstrate to the jury how long it would take to write "Die now" on the victim's back with the substances used, appellant stated that he "might" object on the basis that this would be an opinion. The court noted that the jury could figure out what steps the killer had used, so that the demonstration would not be an opinion. Appellant made no objection and the State proceeded with its demonstration. The issue, obviously, has not been preserved for appellate review. Maryland Rule 1085. Furthermore, the appellant's arguments as recited in his brief go to the weight of the evidence and not to its admissibility.

### 4.

■ The appellant had given a taped statement to the police and during the cross-examination of one of the State's witnesses the defense called for the production of the tape. The witness, Officer Crawford, who took a re-

corded statement from the defendant, was asked on cross-examination:

Q   Do you have a proper recording device?

A   That's correct.

Q   And this was not, the statement was not made under any duress?

A   It was not.

Q   And this was made on, like, a tape-recording cassette?

A   That's correct.

Q   And do you have that cassette?

A   I do not have it.

Q   Who has that cassette?

Mr. Scarborough, is it in your office?

MR. SCARBOROUGH: I don't have it.  Officer May has it, Your Honor.

MR. THOMPSON: Is Officer May outside?

MR. SCARBOROUGH: Your Honor, *we intend to place the tape into evidence, and the transcripts,* [Emphasis supplied] through Trooper Perrot, who was the interrogator, who operated the machine.  I've told Mr. Thompson this and Trooper Perrot is the next witness and that's what we are geared to, setting up the tape recording and have it submitted.

MR. THOMPSON: Your Honor,—

MR. SCARBOROUGH: I would appreciate being able to run my own case.

An argument then ensued as to when the tape recording would be introduced and by whom.  The following discussion then took place in a bench conference between defense counsel and the State's Attorney:

MR. THOMPSON: Trooper Crawford testified that Mr. Morris made a statement to him that he witnessed a murder.  I'm entitled to have the entire statement come in and the statement was made on recording.  He also testified there's a transcript from the recording.  I have established all the grounds to have *the recording*

*brought in.* [Emphasis supplied]. I'm entitled to have the entire statement introduced. Defendant's always entitled to have entire statement introduced into evidence.

MR. SCARBOROUGH: It will be, through the next witness.

MR. THOMPSON: I'm entitled to this on cross-examination. There's no reason not to do it. The recording machine is sitting in Mr. Scarborough's office. Everybody's prepared to go with it.

MR. SCARBOROUGH: I plan to do it with the next witness, Your Honor.

MR. THOMPSON: I'm entitled to do it.

MR. SCARBOROUGH: Foundation, the chain and foundation is not complete until Trooper Perrot testifies, because he was the one that picked up, he's the one initially made contact, met up with the preacher, came back. This witness has testified he's the one that operated the machine. As Mr. Thompson knows, he was interrogator in the statement. It's gonna—

THE COURT: As to both of you, I'm at a loss to see what difference it makes when it comes in.

MR. THOMPSON: I want it in now because I want that statement in.

MR. SCARBOROUGH: It will get in. There's no problem.

MR. THOMPSON: Just thought it should come in when I cross examine him.

MR. SCARBOROUGH: It's my case.

THE COURT: Do you have anything you want to question him about the statement?

MR. THOMPSON: I will after the statement's played, because I'll tell you, the transcript is not accurate.

THE COURT: My suggestion, just trying to find peaceful approach here, that you call him back for further examination after the statement is played, or that you have him sit here and listen to it while it is played, so that you can examine him.

MR. THOMPSON: Okay. Let it be known to the Jury the defense counsel wants that statement in, too.

MR. SCARBOROUGH: I'll let it be put in.

THE COURT: You've already told them that.

MR. THOMPSON: Okay.

THE COURT: That be all right?

MR. THOMPSON: That's fine.

THE COURT: Okay.

(Conclusion of the discussion at the Bench.)

THE COURT: Sergeant, if you will take the stand, we've just agreed here at the Bench Trooper Perrot will be the next witness and the statement will then be played in to the Jury on the tape, from the tape, and that defense counsel wishes to examine you, cross examine you as to certain portions of the tape, as I understand it. And, therefore, we would like to ask you to remain in the Courtroom, when the tape is played.

THE WITNESS: Yes, sir.

Trooper Perrot was then called as a witness by the State. During his testimony in chief the tape recording was played to the jury and the jury was furnished with a typed transcript of the recording. The record seems to indicate that only the transcript was formally offered into evidence by the State. After the case had been submitted to the jury and it had begun its deliberations for some time, the jury requested that the tape recording be furnished to them so that they might hear it again. There then ensued a heated and confusing debate between the trial court, defense counsel and the Assistant State's Attorney. In order to determine properly the validity of the ruling of the court it is necessary to include in some detail the argument of counsel and the conflicting rulings of the court.

The trial judge first announced that the jury would be permitted to have the tape played and gave the following reason:

THE COURT: The Court, having reviewed the transcript of a colloquy at the Bench regarding the introduc-

tion of the statement of the Defendant, beginning at 5:37 A.M. on the morning of August 6th, 1982, to the Maryland State Police, is of the opinion that whether or not it was to come into evidence is ambiguous. But the Defendant will be given the benefit of the doubt so as to not create any grounds for error. And the Jury will be permitted to have the tape played, even though the cassette and the recording, itself, was never put into evidence. I am doing this after agreement, which the transcript will show, of not only the defense counsel, but the Defendant, himself, that he would not use this decision of mine as any basis for appeal or objection.

The Assistant State's Attorney at that point elected to raise an issue of the possibility that in post-conviction proceedings the defendant or counsel might contend that the tape recording might have been tampered with. That discussion is found in the record as follows:

MR. SCARBOROUGH: What if they are going to say he could have come back and say what if it's been tampered with, changed? I think you better re-think what they can do on post-conviction, what they can do on appeal. Again, we are not, I'm thinking of potential problems.

MR. THOMPSON: Are you trying to tell me you're going to tamper?

MR. SCARBOROUGH: I'm saying that, I'm talking about what a Defendant could raise at some time. Judge knows what I'm talking.

THE COURT: Yes, I do.

MR. SCARBOROUGH: Could be contaminated or changed or the twelve-minute gap of Nixon, or anything to bring up. I think we better think it through.

MR. THOMPSON: Your Honor, that tape, tape's in the possession of the State's Attorney or his agent. And I trust him. I don't think anyone would have changed that thing at all. If it has been changed, it's been changed by the State or by one of its agents.

MR. SCARBOROUGH: That's the issue. That's the reason the rules of evidence would be, that wasn't introduced like that. It was played in front of the Jury. We all heard it. But now you're talking about, now he's raising claims that could come back to haunt and be used forever.

MR. THOMPSON: Mr. Scarborough raised the issue of its being tampered with. As far as I'm concerned, I'm sure that neither the police or State's Attorney would tamper with this case.

As a result of this discussion the trial judge reversed his previous ruling and stated:

THE COURT: Anything else, gentlemen?

MR. THOMPSON: No, Your Honor.

THE COURT: All right. The Court is not going to permit the tape to go to the Jury and it will state its reasons: This Bench colloquy originated because Mr. Thompson, the defense counsel, wanted the tape played before he cross examined Sergeant Crawford. He makes references to wanting the statement to come in; that there is a recording.

Arguably, it could be interpreted, possibly, either way; that he was making an oblique request that the taped recording come in. It is equally possible that Mr. Scarborough, for the State, did not understand that, this oblique reference, to mean that he wanted the tape to come in. Mr. Scarborough said that the tape would be played.

That the Court, as it listened and thought, perceived the best solution of the matter would be to let the tape come in through the interrogator, Trooper Perrot. While at the same time, the right of Mr. Thompson to cross examine Crawford, after it came in, would be preserved, if we let Crawford sit in the Courtroom, contrary to the sequestration rule, to the benefit of the Defendant, so he can listen to it at that time, so Mr. Thompson could cross examine him, after the tape was played.

The fact is, after the tape was played, Mr. Thompson had no cross examination of Sergeant Crawford, but that's beside the point. This is a situation where the Court must make a judgment. And the judgment the Court prefers to make is one that is in accordance with the usual rules, rather than some departure from the usual rules in order to try to benefit a Defendant.

The Court finds as a fact and holds that it's unclear whether or not the tape—the Court holds as a fact and finds that there could easily have been misunderstanding of counsel as to what the other one had done. That was up to Mr. Scarborough to proceed in his own case as he chose. It was up to Mr. Thompson, as defense counsel, if he wished the tape in and saw that it was not in, to ask that it be put in. Mr. Thompson did, indeed, in the course of this case, put in seven or eight, at least, defense exhibits during the presentation of the case-in-chief by the State. So, he was well aware that he could have done it.

I recognize that not everything is done in a trial by any attorney or any judge that ought to be done. We can't have a perfect trial. But we, nevertheless, feel that the rule should be followed, of normal introduction of evidence, and that if it's not introduced, it can't go to the Jury.

Surely, after several days of not being in any particular custody and not being an exhibit here in the Court, under the custody of the Court and the Clerk, the allegation could be made by post-conviction attorney that the tape as the Jury heard it, we cannot say with certainty an appeals court wouldn't agree with them, had not been in some way altered or tampered with and, therefore, we must reverse. The Court would prefer, if there's going to be a reversal, that it's going to be reversed on the action the Court is now taking rather than some such ground as this.

Accordingly, the Court will not permit the tape to go to the Jury.

THE COURT: I might add that there is a transcript of the tape, word-for-word, in evidence as Exhibit 59, State's Exhibit 59. And that the Jury has, for the record, as the record will clearly show, listened to this tape and followed along with State's Exhibit 59, the transcript, as they did listen to the tape; and, therefore, it would be redundant for them to play the tape again. Isn't as though they had not heard it.

Shortly after the judge had notified the jury that he would not permit the tape to be played for them again, the jury returned the guilty verdicts in this case.

In considering the validity of the trial court's ruling in this controversy we must look to the Maryland Rules of Procedure. Maryland Rule 758 provides in pertinent part:

a. Items Taken to Jury Room.

Upon retiring for deliberation, the jury may, with the approval of the court, take into the jury room the exhibits which have been admitted into evidence and the charging documents. Upon the request of a party or upon the court's own motion, the charging documents shall reflect only those charges upon which the jury is to deliberate. The court may impose safeguards for the preservation of the exhibits and the safety of the jurors.

Section c of the same rule provides:

c. *Jury Request to Review Evidence.*

Whenever the jury makes a request for a review of any testimony or other evidence, the court, after notice to the parties, may submit the testimony or evidence requested by the jury. The court also may submit other evidence relating to the same factual issue on which the jury requested testimony or evidence in order that undue prominence not be given to the evidence requested.

Obviously, these rules vest the trial judge with the discretion to determine what exhibits shall be permitted into the jury room but this judicial discretion may not be abused.

The State argues that the trial judge did not err when he refused the jury's request to be permitted to again hear the

tape recording played during its deliberations. It gives as its reason for this contention the same justification adopted by the court to support its action, *i.e.*, that the tape recording was never properly admitted into evidence. From our own independent review of the record, however, we conclude that both the State and the trial judge were in error in reaching this conclusion.

We perceive that no magic words are necessary to find that a piece of evidence has been admitted as an exhibit in the trial of a case. In this proceeding, the defendant clearly requested the court to admit the tape recording into evidence when the State's witness was on the witness stand. The State objected to its admission *at that time* only on the basis that it wanted to conduct its case in its own fashion and stated that the *recording* would be brought in through its next witness. The recording was played and a transcript furnished to the jury during the next witness's testimony. Throughout the case thereafter both the State and the defense referred to and argued concerning the significance of the recorded statement. The record reveals that in closing argument the State argued that the appellant had deliberately fabricated the statement. The prosecuting attorney argued to the jury concerning inconsistencies and implausibilities in the statement. The defense, in its closing argument, contended that at the time the statement was made the appellant was under the influence of alcohol and was fatigued. The argument was also advanced by the defense that the interrogation had been conducted in a herky-jerky fashion and that this would account for the appellant's apparent confusion about details. Counsel for the defense suggested that this was discernible from the hearing of the actual tape rather than from the typed transcript. It is not surprising, therefore, that the jury requested an opportunity to hear the tape recording again.

The record makes it clear that the State's Attorney and the trial judge were more concerned with defensive tactics against a possible reversal or successful post-conviction proceeding than they were about the appellant's right to a

fair and impartial trial.  Merely because defense counsel did not formally request the judge to admit the tape recording as an exhibit was not sufficient cause to refuse the jury's request to hear the tape again.  For all intents and purposes, based on the use of the tape made both during the trial and the closing arguments it was *de facto* already admitted into evidence.  We cannot determine what prejudice, if any, the appellant suffered as a result of the judge's ruling but it is clear to us that under the facts of this case the refusal to comply with the jury's request was prejudicial error and requires the granting of a new trial.

### 5.

Appellant in his next complaint contends that the trial court committed error when it refused to conduct an evidentiary hearing concerning alleged juror misconduct and refused to grant a new trial motion based on the alleged misconduct.  This issue is moot in the light of our conclusion of the preceding issue.

### 6.

■ Finally, the appellant argues that there was insufficient evidence to sustain his conviction of first degree murder.  We do not agree.  The evidence showed that the victim was initially strangled manually and that she was then strangled with an electric cord pulled from a radio in the room where she was killed.  As the Court of Appeals said in *Colvin v. State*, 299 Md. 88, 472 A.2d 953 (1984),

> [T]his Court has found sufficient time for reflection and decision where there is an interval between fatal blows or where the assault occurs over a protracted period of time.  In *Chisley*, [202 Md. 87, 95 A.2d 577 (1953) ], the firing of two or more shots separated by an interval of time was sufficient evidence of deliberation and premeditation for the jury.  [*Id.*, at 109, 95 A.2d 577].

In this case, it seems clear the interval between the two acts of strangulation amounted to a sufficient period of time for the jury to have concluded that there was deliberation and premeditation.  Additionally, the writing of "Die

now" on the victim's back, when taken with the suggestion in the record that the victim's body may have been tested for vital signs by the use of a pin, when considered together with the circumstances of the strangulation were more than sufficient to permit a rational fact finder to have found premeditation beyond a reasonable doubt. *See Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980).

Similarly, applying the tests mandated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and *State v. Rusk,* 289 Md. 230, 424 A.2d 720 (1981), there was sufficient evidence to permit a rational trier of fact to conclude that the appellant was the perpetrator of the crimes charged. The evidence showed that the victim and the appellant left a bar together at about midnight on the night she was killed. Appellant admitted being with the victim when she was killed although he claimed someone else (Bursler) had killed her. There was evidence Bursler was elsewhere when the killing occurred. The evidence further showed that appellant had a stain on his shirt similar to the materials used to write on the victim's back. Appellant called the Elkton police and described the crime and its location, in detail, and apologized for the occurrence of the crime. Finally, appellant gave an exculpatory statement to the police which was inconsistent in several particularities with the other evidence in the case. The jury was the ultimate trier of the facts and it had more than sufficient evidence to permit it to find beyond a reasonable doubt that the appellant was the perpetrator of the crime.

■ Appellant's argument that there was insufficient evidence to permit the jury to find him guilty of arson beyond a reasonable doubt is without merit. He contends that the State failed to prove that the fire consumed a portion of the building structure. The record reveals, however, that the fire investigator specifically testified that the *floor* of the building was burned and a photograph of the burned floor was offered into evidence. Appellant suggests the floor may have been dirt or concrete. Nothing in the record

supports this suggestion. We conclude that the State introduced sufficient evidence to permit the jury to decide that a portion of the structure of the building was burned.

JUDGMENTS REVERSED, REMANDED FOR NEW TRIAL, COSTS TO BE PAID BY CECIL COUNTY.